UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ROBERT BROWN,

                    Plaintiff,            **MEMORANDUM**
                                             **AND  O R D E R**

        - against -              04 CV 3938 (CLP)

UNITED STATES OF AMERICA,

                    Defendant.
-----------------------------------------------------X

On September 13, 2004, plaintiff Robert Brown commenced this action against the United States of America, the United States Parks Department, and the United States Department of the Interior (collectively, the "government"), pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-80 ("FTCA"), alleging that he suffered serious injuries as a result of the government's negligence in failing to properly maintain the sandy bottom of the Jacob Riis Park ("Riis Park") ocean beach, and in failing to warn swimmers not to dive in the surf because the water was too shallow.

On September 19, 2006, the parties consented to refer this action to the undersigned for all purposes including entry of judgment. Thereafter, by Notice of Motion dated December 12, 2006, the government moved for summary judgment on plaintiff's claim.

For the reasons set forth below, the government's motion for summary judgment on plaintiff's negligence claim is denied.

# FACTUAL BACKGROUND

It is undisputed that on July 26, 2003, plaintiff Robert Brown, then age 30, and his girlfriend, Michelle Berrio, visited the beach at Jacob Riis Park ("Riis Park"). (Pl.'s 56.1 Stmnt ¶ 3; Def.'s 56.1 Stmnt ¶ 4).[1] Riis Park, located in the Jamaica Bay Unit of Gateway National Recreation Area in Queens, New York, is owned and operated by the United States.[2] The park fronts the Atlantic Ocean and is administered by the National Parks Service ("NPS"), a unit of the United States Department of the Interior. (Def.'s Mem. at 3;[3] Pl.'s 56.1 Stmnt ¶ 1; Def.'s 56.1 Stmnt ¶ 3).

---

[1]Citations to "Pl.'s 56.1 Stmnt" refer to the Rule 56.1 Statement of Undisputed Material Facts submitted by plaintiff Robert Brown, dated February 8, 2007. Citations to "Def.'s 56.1 Stmnt" refer to the government's Rule 56.1 Statement of Undisputed Material Facts submitted in support of its motion for summary judgment, dated December 12, 2006.

[2]Mr. Brown's Complaint, filed on September 13, 2004 ("Compl."), indicates that the government owned and operated Riis Park at the time of the accident. (Compl. ¶ 5). The government admits this allegation in its Answer, dated November 17, 2004 (Answer ¶ 5), but an issue as to ownership is raised by the report of the government's expert on the law of real estate title, James M. Pedowitz, Esq. (See Letter of James M. Pedowitz, dated September 14, 2005 ("Pedowitz Ltr") ¶¶ 5-7, attached as Exhibit A to the March 13, 2007 Declaration of Kevan Cleary ("Cleary March 2007 Decl.")). According to Mr. Pedowitz, much of the area within the Gateway National Recreation Area was conveyed to the United States by the City of New York in a deed dated March 1, 1974. (Pedowitz Ltr ¶¶ 2, 5). However, Mr. Pedowitz states that the place at Riis Park where the plaintiff's accident occurred was within an excluded area in the City deed and not on lands owned by the United States. (Id. ¶¶ 5-7). Since the government has not pursued this issue as a basis for its current motion for summary judgment and, in deciding a summary judgment motion, a court must draw all inferences and resolve all ambiguities in favor of the nonmoving party, the Court has not considered this argument. See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999).

[3]Citations to "Def.'s Mem." refer to the defendant's Memorandum of Law in support of its motion for summary judgment, dated December 12, 2006.

Plaintiff and Ms. Berrio arrived at Riis Park between 11:00 and 11:30 a.m.,[4] and remained near the shore between Bay 7 and Bay 8 until approximately 1:15 p.m., at which time plaintiff indicated his intention to enter the water. (Pl.'s 56.1 Stmnt ¶ 8; Def.'s 56.1 Stmnt ¶ 8). It is undisputed that plaintiff "was an experienced ocean swimmer" who had taken swimming lessons in high school and who had been swimming at nearby Rockaway Beach when he was a teenager. (Pl.'s 56.1 Stmnt ¶¶ 5-7). Plaintiff proceeded to run into the surf until the water reached between knee-high and waist-high depth,[5] at which time he dove into the water. (Pl.'s 56.1 Stmnt ¶ 9; Def.'s. 56.1 Stmnt ¶ 9). The parties not only dispute how deep the water was at the time plaintiff entered the water, but they also dispute the manner in which he dove into the water. (Compare Pl.'s 56.1 Stmnt ¶ 9, with Def.'s 56.1 Stmnt ¶ 9). The government contends that Mr. Brown dove down into the water in what it describes as a "Superman-style" dive – "head-first with his arms extended." (Def.'s 56.1 Stmnt ¶ 9). Plaintiff maintains that, after entering the water, he dove forward, parallel to the surface of the water. (Pl.'s 56.1 Stmnt ¶ 9). Plaintiff claims that while he "was completely underwater," he struck his head on something under the water that he did not see,[6] rendering his legs limp and causing him to flail his arms for

---

[4]Compare Brown Deposition dated April 28, 2005 ("Brown Dep."), attached as Exhibit A to the December 12, 2006 Declaration of Kevan Cleary ("Cleary December 2006 Decl."), with Berrio Deposition, dated June 23, 2005 ("Berrio Dep."), attached as Exhibit B to the Cleary December 2006 Decl., at 9.

[5]While the government contends that the water level was between "knee-high" and "waist-high" when Mr. Brown executed his dive (Def.'s 56.1 Stmnt ¶ 9), plaintiff maintains that it reached his waist. (Pl.'s 56.1 Stmnt ¶ 9). Mr. Brown's own deposition, however, indicates that he dove into the surf when the water level was "knee-high." (See Brown Dep. at 35).

[6]Although Ms. Berrio testified that Brown said "[h]e hit something hard" with his head (Berrio Dep. at 35), Mr. Brown later claimed that he "struck his head on a 'soft' surface (i.e., sand as opposed to a rock or submerged object)." (Pl.'s 56.1 Stmnt ¶ 16). Later, he described

assistance. (Brown Dep. at 38-39; Def.'s Mem. at 4).

Upon noticing plaintiff's condition, Ms. Berrio and an unidentified bystander entered the surf and removed plaintiff from the water. (Brown Dep. at 42-44; Def.'s Mem. at 4). Shortly thereafter, lifeguard Cristen Mullen arrived on the scene and called for assistance from NPS Emergency Medical Technician ("EMT") Keith Sevransky. (Brown Dep. at 52-53; Def.'s Mem. at 4-5). Ms. Mullen's supervisor, lifeguard Lieutenant Steve Snapper, also arrived on the scene in an all-terrain vehicle and assisted Ms. Mullen in stabilizing plaintiff's head and neck. (Brown Dep. at 53-54; Def.'s Mem. at 4-5). Maryanne Sawyer and Sonja Hanley, EMTs with the NPS, responded to the call Ms. Mullen had initially made to Mr. Sevransky, and arrived in an ambulance. (Brown Dep. at 55-56; Def.'s Mem. at 5). They placed a cervical collar on plaintiff's neck, strapped him to a backboard, lifted him into the ambulance, and transported him to the Bay 5 First Aid Station. (Id.) Despite their efforts, plaintiff sustained permanent and severe personal injuries, resulting in quadriplegia. (Compl. ¶¶ 17, 20).[7] Plaintiff now contends that his head struck a sandbar on the ocean floor and asserts that the government's negligence in failing to warn of the sandbar's presence was the proximate cause of his injuries. (Compl. ¶ 18).

The government asserts that there was no sandbar where plaintiff's injury occurred and that plaintiff dove into shallow water, causing him to strike his head on the sea bottom. In support of this proposition, the government cites to the testimony of lifeguard Mullen, who stated that earlier that morning, she swam in the surf where plaintiff's injury occurred and discovered

the contact as a "soft tap." (Brown Dep. at 35).

[7]The government denies this allegation in its Answer. (Answer ¶¶ 16-21). It does admit, however, that Mr. Brown sustained spinal injuries as a result of his dive. (Def.'s 56.1 Stmnt ¶ 10).

no hidden obstructions. (Def.'s Mem. at 5 (citing Mullen Dep.[8] at 17)). A second lifeguard, Lieutenant Snapper, also testified that immediately following plaintiff's dive and accident, he investigated the area where the accident occurred and found no sandbars, submerged ridges, pieces of wood, or rocks. (Def.'s Mem. at 5 (citing Snapper Dep.[9] at 10)).[10]

The government further notes in its Reply Memorandum of Law in support of defendant's motion for summary judgment ("Def.'s Reply Mem.") that plaintiff has posited several different and allegedly inconsistent theories for how his injury may have occurred. (Def.'s Reply Mem. at 3; see also Def.'s Mem. at 5-6). In documents submitted on April 27, 2004 in support of his administrative claim with the NPS, plaintiff first claimed that he hit his head on a wood piling or jetty. (Def.'s Mem. at 5). He then alleged in his Complaint, filed on September 10, 2004, that his head struck a "submerged and hidden object identified as a jetty, piling and or sand bar." (Compl. ¶ 16). Subsequently, in his Memorandum of Law in opposition to defendant's motion for summary judgment, dated January 26, 2007 ("Pl.'s Mem.), plaintiff argued that his head struck either a sandbar or an unusual upslope of the sea floor. (See Pl.'s Mem. at 3, 13; Pl.'s 56.1 Stmnt ¶ 10). This claim is consistent with the expert report submitted by Francis A. Cosgrove, plaintiff's expert on beach and recreation safety, whose report focuses on the dangers posed by

---

[8]Citations to "Mullen Dep." refer to the transcript of Ms. Mullen's deposition attached as Exhibit F to the Cleary December 2006 Decl.

[9]Citations to "Snapper Dep." refer to the transcript of Lieutenant Snapper's deposition attached as Exhibit C to the Cleary December 2006 Decl.

[10]Given that there is a dispute as to the presence of the sandbar, the Court, for the purposes of this summary judgment motion, will proceed under the assumption that a sandbar existed at the time of Mr. Brown's accident. See Cumberbatch v. Port Authority of New York & New Jersey, No. 03 CV 749, 2006 U.S. Dist. LEXIS 88853, at *7 (S.D.N.Y. Dec. 7, 2006).

sandbars (Cosgrove Aff.[11] ¶ 3), thus suggesting that plaintiff has "abandoned the claim that he struck a 'jetty [or] piling.'" (Def.'s Mem. at 6). The Court notes, however, that the accident rendered Mr. Brown without the ability to speak for quite some time, thereby forcing plaintiff's counsel to rely on the testimony and documentation of others, including government employees, in drafting the administrative claim and Complaint. (Tr.[12] at 9; see also NPS Patient Care Record, attached as Exhibit 3 to Pl.'s Mem.). As plaintiff has since made clear his contention that he struck his head on a sandbar, the Court will only consider that argument. (Tr. at 11).

## DISCUSSION

The government moves for summary judgment arguing that: (1) under New York law, there was no duty to warn of the presence of sandbars on the ocean floor and, (2) even assuming the existence of such a duty, the government's failure to warn was not the sole, proximate cause of plaintiff's injuries. (See Def.'s Mem. at 2, 11-13). In opposing the motion for summary judgment, plaintiff disputes both of the government's contentions, asserting that more recent New York precedent has made it clear that landowners may be liable for the failure to warn of the presence of sandbars (see Pl.'s Mem. at 11 (citing Ziecker v. Town of Orchard Park, 75 N.Y.2d 761, 551 N.E.2d 99, 551 N.Y.S.2d 898 (1989))), and that in this case, even if the law did not impose a duty to warn, the government voluntarily assumed a duty to discover and protect bathers at Riis Park from sandbars. (Id. at 13-15). In the alternative, plaintiff argues that

---

[11]Citations to "Cosgrove Aff." refer to the Expert Affidavit of Francis A. Cosgrove dated January 29, 2007.

[12]Citations to "Tr." refer to the transcript of the oral argument on the motion for summary judgment heard on April 13, 2007.

defendant had actual or constructive notice of the dangers posed by sandbars at this beach and thus is liable under New York law. (Id. at 16-17). Finally, plaintiff disputes the government's proximate cause argument, asserting that the act of diving in shallow water is not so unforeseeable as to constitute a superseding cause to relieve a landowner of its duty to warn. (Id. at 18). Thus, under these circumstances, plaintiff asserts that summary judgment is inappropriate.

A. Summary Judgment Standards

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v.

7

New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party.").

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).


B. Landowner's Duty of Care

Pursuant to the FTCA, Congress authorized a limited waiver of the government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Here, since the alleged negligent act occurred in the State of New York, the law of New York is controlling. See 28 U.S.C. § 2674; Hess v. United States, 361 U.S. 314 (1960); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

Under New York law, the standard of care owed by a landowner to someone lawfully on the landowner's premises requires that "'the landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.'" Basso v. Miller, 40 N.Y.2d 233, 240-41, 352 N.E.2d 868, 872, 86 N.Y.S.2d 564, 568 (1976) (internal citation omitted); see also Akins v. Glens Falls City School Dist., 53 N.Y.2d 325, 333, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644, 648 (1981) (Cooke dissenting). Thus, in order to establish negligence on the part of the government, plaintiff must prove the existence of a duty owed to him, a breach of that duty, and that he suffered injury as a result of the government's breach of that duty. See Akins v. Glens Falls City School Dist., 53 N.Y.2d at 333, 424 N.E.2d at 535, 441 N.Y.S.2d at 648. The question of what constitutes reasonable care under the circumstances of a particular case is generally a question to be decided by the trier of fact. Id. at 334, 424 N.E.2d at 536, 441 N.Y.S.2d at 649.

In moving for summary judgment, the government argues that plaintiff cannot sustain his burden of establishing these elements and that the government cannot be held liable because it was under no duty to warn plaintiff of the existence of the sandbar.

1) Reasonable Care Standard

The duty owed by property owners to warn of the existence of sandbars on the ocean floor was addressed by the New York Court of Appeals in Herman v. State of New York, 63 N.Y.2d 822, 472 N.E.2d 24, 482 N.Y.S.2d 248 (1984). On facts similar to this case, the plaintiff in Herman ran into the water at a New York beach and executed a surface dive in waist-high water,

striking his head on a sandbar not visible from the surface and sustaining serious and permanent injuries. Id. at 823, 472 N.E.2d at 25, 482 N.Y.S.2d at 249. In ruling that the State was not negligent, the court in Herman concluded that there is no duty to warn of the "natural, shifting condition" of sandbars on the ocean floor. Id. The court reasoned that "to be liable for failure to warn of a dangerous condition, a property owner must have notice of the condition itself as well as the unreasonable risk it creates," and "defendant could not anticipate a danger to swimmers simply from the existence of the natural, shifting condition of sand bars in the ocean." Id.

Consistent with the holding in Herman, New York courts presented with facts similar to the instant case have held that there is no duty to warn of the presence of sandbars on the ocean floor. See Saland v. Village of Southampton, 242 A.D.2d 568, 569, 662 N.Y.S.2d 322, 323 (2d Dep't 1997) (holding that where plaintiff jogged into the surf and dove head-first into a submerged sand bar, the defendant Village was not liable and had no duty to "anticipate and protect against threats to swimmers arising from the existence of natural, transitory conditions of the ocean floor"); Smyth v. County of Suffolk, 172 A.D.2d 741, 569 N.Y.S.2d 128, 129 (2d Dep't 1991) (finding no liability for failing to warn of the transitory conditions on the ocean floor where plaintiff sustained personal injuries after executing a surface dive into the ocean and striking his head on the sea bottom); Perez v. Town of East Hampton, 166 A.D.2d 640, 561 N.Y.S.2d 69 (2d Dep't 1990) (finding no liability on the part of defendant where plaintiff jogged into waist-deep water, executed a surface dive, and struck his head on a submerged sandbar, and ruling that "[u]nder Herman, property owners are relieved of the duty to warn of sandbars").[13]

_____

[13]In addition to stressing the transient nature of sandbars in concluding that property owners have no duty to protect swimmers against threats "arising from the existence of natural . . . conditions of the ocean floor," New York courts have consistently stated that a person who

Indeed, in McCullough v. United States, this Court relied on Herman in holding that the government had no duty to warn of sandbars at Riis Park where the plaintiff claimed injuries based on nearly the exact same set of facts as the current action. No. 80 CV 3037, 1995 WL 264033, *1 (E.D.N.Y. Apr. 27, 1995). The plaintiff in McCullough sustained injuries at Riis Park after running into the surf and diving outward in water that was above his waist, striking his head on a submerged sandbar. Id. at *1. There were no signs posted on the beach warning of any dangerous or hidden conditions such as sandbars. Id. In finding that the United States was under no duty to warn of the presence of sandbars, the court in McCullough noted that "[t]he facts in Herman are precisely the same as the facts here in every respect." Id. at *2. The Court added that the highly transitory nature of sandbars would render any warning meaningless and that the plaintiff should have known of the dangers posed by sandbars.

In response, plaintiff argues as an initial matter that "more recent New York State Court of Appeals precedent than the Herman case" governs here and that under this precedent, plaintiff has stated a viable claim. Specifically, plaintiff contends that this Court is bound by the holding

---

participates in water sports assumes the reasonably foreseeable risks therein. See Saland v. Village of Southampton, 242 A.D.2d at 569, 662 N.Y.S.2d at 323 (implying that diving into a submerged sandbar is a reasonably foreseeable risk of ocean swimming and citing Smyth v. County of Suffolk, 172 A.D.2d at 741, 569 N.Y.S.2d at 129, and Perez v. Town of East Hampton, 166 A.D.2d at 640, 561 N.Y.S.2d at 69). In Herman, the Appellate Division also reasoned that the plaintiff knew or should have known of any danger posed by sandbars because he had frequented the area of the beach where his injury occurred approximately six times in the summer of his accident. See Herman v. State of New York, 94 A.D.2d 161, 163, 463 N.Y.S.2d 501, 502 (2d Dep't 1983), aff'd, 63 N.Y.2d 822, 472 N.E.2d 24, 482 N.Y.S.2d 248 (1984). Here, plaintiff conceded that he had been swimming in the ocean when he was a teenager and had been to Riis Park approximately five years prior to the day of his accident. (Def.'s Mem. at 3; Brown Dep. at 16-19). It is reasonable to conclude that, having gone swimming in the ocean before, plaintiff knew or should have known of the existence of sandbars and the potential danger of diving headfirst into one. However, the Court has not considered this in rendering this opinion.

in <u>Ziecker v. Town of Orchard Park</u>, where the plaintiff was injured when he dove into a man-made lake and struck the bottom, sustaining injuries. 75 N.Y.2d 762, 551 N.E.2d 99, 551 N.Y.S.2d 898 (1989). The plaintiff in <u>Ziecker</u> asserted that the defendant was negligent in failing to warn against diving into the lake because it was too shallow, in failing to maintain the artificial lake in a way that would preserve what appeared to be its natural slope, and in failing to keep the lake bottom free of debris. <u>Id.</u> Following a jury trial in which the defendant was found to be partly liable for plaintiff's injuries, the Appellate Division reversed, holding that the plaintiff's action in diving into the water was "an unforeseeable superseding cause barring defendant's liability." <u>Ziecker v. Town of Orchard Park</u>, 147 A.D.2d 974, 975, 538 N.Y.S.2d 671, 672 (4th Dep't), <u>rev'd</u>, 75 N.Y.2d 761, 551 N.E.2d 99, 551 N.Y.S.2d 898 (1989). The Court of Appeals then overturned the Appellate Division's reversal, finding that there was "sufficient evidence in the record from which the jury could have rationally concluded that plaintiff was not aware of the depth of the water at the point he would reach on his dive. . . ." <u>Id.</u> at 763, 551 N.E.2d at 101, 551 N.Y.S.2d at 900. As a result, the court found that plaintiff's conduct was not reckless as a matter of law and could not be said to be a "superseding act absolving defendant from liability." <u>Id.</u> (citations omitted).

Although plaintiff contends that <u>Ziecker</u> is controlling in this case, the facts in <u>Ziecker</u> are clearly distinguishable from the facts in <u>Herman</u> and in the instant case. <u>See</u> <u>McCullough v. United States</u>, 1995 WL 264033, at *2 (remarking that "a mere statement of the facts serves to starkly reveal the dissimilarity between <u>Ziecker</u> and <u>Herman</u>" and noting that "[p]erhaps the most telling dissimilarity between the cases is the failure of the court of appeals in <u>Ziecker</u> to make any reference to <u>Herman</u>"). Most notably, the plaintiff in <u>Ziecker</u> dove into a man-made lake rather

than a natural body of water. This distinction between naturally occurring and man-made hazards has been a key focus of New York courts considering claims of failure to warn of a dangerous condition. See, e.g., Darby v. Societe des Hotels Meridien, No. 88 CV 7604, 1999 WL 459816, at *8 (S.D.N.Y. June 29, 1999) (stating that "the question is whether the condition that created the risk was a naturally occurring or man-made hazard," and finding defendant had no duty to warn because "a rip current, like a sandbar, is a natural condition"). Indeed, the distinction between naturally occurring and man-made hazards is consistent with the rationale set out in Herman, where the court refused to impose a duty to warn of the natural, transitory conditions of the ocean floor, even when those natural conditions interact with man-made features such as jetties. See Herman v. State of New York, 94 A.D.2d at 163, 463 N.Y.S.2d at 502. Presumably, a landowner would have far less difficulty monitoring the floor of an artificial lake than would the owner of a beach fronted by the Atlantic Ocean.

Moreover, New York courts have consistently declined to conclude that the government assumes a duty to warn and protect swimmers from risks inherent in swimming. One entering a body of water to swim assumes certain risks and "cannot rely upon the assumption that it has been made safe . . . in the absence of a representation on the part of the owner to that effect." Pope v. State of New York, 198 Misc. 31, 35, 96 N.Y.S.2d 708, 712 (Ct. Cl. 1950) (internal citations omitted) (holding that state was not negligent in maintenance of pond overgrown with grass and bushes, which were indication that pond was not a swimming area; plaintiff assumed the risks and was contributorily negligent in allowing his children to swim without inquiry or investigation and without any lifeguard supervision or lifesaving equipment when no one in party could swim). Generally, a guest "accepts the premises as they are, subject to notice of reasonably

13

unforeseeable danger involving unreasonable risk, of which the owner has knowledge." La Rocco v. State of New York, 7 Misc. 2d 161, 165-66, 165 N.Y.S.2d 301, 305-06 (Ct. Cl. 1957) (internal citations omitted) (reasoning that "[t]he State is not an insurer of those who make use of its park facilities" and need not eliminate every danger in finding that it was claimant's duty to determine if water was safe for diving where claimant was injured when he struck his head after diving into water he believed was four feet deep). Specifically, the courts have found that "one who engages in such a sport as swimming accepts the dangers inherent in the sport so far as they are obvious and necessary." Maull v. State of New York, 16 Misc. 2d 499, 503, 185 N.Y.S.2d 182, 187 (Ct. Cl. 1959) (internal citations omitted) (finding that claimants failed to establish proximate cause of death was failure by state to exercise reasonable care in maintenance, control, and supervision of recreational park where six year-old boy drowned despite supervision of lifeguard and efforts to resuscitate). Despite the fact that "[it] is a customary way of entering the water," surface diving constitutes one of the dangers inherent in the sport and "must still be attended to with that degree of care which the circumstances demand." Herman v. State of New York, 109 Misc. 2d 455, 462, 439 N.Y.S.2d 1018, 1023 (Ct. Cl. 1981).

Accordingly, the Court rejects plaintiff's argument that Ziecker is controlling authority for the reasons stated in McCullough and concludes that, given the similarity in facts, Herman governs on the issue of the government's duty to warn in these circumstances.

2) Liability Based on an Assumed Duty

Plaintiff poses an alternative theory of liability, arguing that even if New York law does not impose a duty to warn on the defendant, the government should nonetheless be held liable because it voluntarily assumed a duty to discover and protect bathers from sandbars and that its negligent failure to perform that assumed duty was the proximate cause of plaintiff's injury.

It is an established principle of New York law that "[w]here a person voluntarily assumes the performance of a duty, he is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task." Wolf v. City of New York, 39 N.Y.2d 568, 573, 349 N.E.2d 858, 860, 384 N.Y.S.2d 758, 760 (1976); see also Kurzweg v. Hotel St. Regis Corp., 309 F.2d 746, 747 (2d Cir. 1962) (holding that even though defendant hotel was under no duty to furnish a doorman, where a landowner, "under no duty to act . . . voluntarily undertakes to act and causes injury through his negligent act or failure to act," he may be liable under New York law); Parvi v. City of Kingston, 41 N.Y.2d 553, 559, 362 N.E.2d 960, 964, 394 N.Y.S.2d 161, 165 (1977) (noting that "[t]he case law is clear that even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care") (internal citations omitted).

In support of his argument that the government voluntarily assumed a duty to warn of sandbars, plaintiff cites to several provisions in an internal manual of the NPS, entitled "Gateway National Recreation Area Breezy Point Site/Great Kills Site Lifeguard Manual" ("Gateway Manual" or "Manual"), which was published in 1997 and in effect at the time of plaintiff's accident. One provision of the Gateway Manual is entitled "Sand Bar" and reads in pertinent part as follows:

15

Definition: The danger presented by the sand bar is manifest when non-swimmers walk to the sand bar at low tide and then attempt to return to shore after the tide has come in and now the water is over their heads. This particularly applies to children. You must be very aware of the changes in the tides.

a. Sand bar with shallow connection:

Non-swimmers access the sand bar by a shallow area. As the tide comes in, this area becomes deep enough so that the strong current will sweep them into deeper and deeper water.

b. Sand bar running perpendicular to shore:

Non-swimmers may venture onto a shallow area jutting out into the ocean only to be swept into deeper water by the current.

Although this provision demonstrates an awareness of the existence of sandbars and cautions against a potential drowning danger posed by sandbars, it does not impose a duty to warn swimmers of the danger of diving head-first into a sandbar.

Similarly, the second provision of the Gateway Manual cited by plaintiff and entitled "Beach Hazards" encourages lifeguards to "constantly be aware of rapidly changing situations and conditions" and to "become familiar with the beach at each individual area in order to be effective and prevent water accidents," but it does not specifically mention the dangers posed by sandbars or a duty to warn of them. The Manual states:

Beach conditions change daily so the key is to become aware of all those factors which contribute to the make-up of the beach. Aside from the normal tide, current, bottom and atmospheric changes which take place, you will be expected to be constantly aware of the changes which can occur such as:

1. Large or hazardous surf conditions.
2. Obstructions: Due to erosion, a wide variety of large

16

objects can appear.

Finally, there is a general provision of the Gateway Manual that provides: "[i]t is important to note that the configuration of the bottom can be determined by careful observation of the type of waves which are breaking on the beach." Although these sections warn lifeguards to become aware of beach conditions, including tide, current, and ocean bottom, they do not specifically mention sandbars, nor do they discuss or even allude to the potential danger posed to a beachgoer who dives into a submerged sandbar.

Apart from the absence of any reference in the Manual requiring lifeguards to warn of the specific danger at issue, the government disputes plaintiff's general claim that the Gateway Manual imposes an independent duty on the part of the NPS to warn of the danger alleged in this case. In its Reply Memorandum, the government argues that the limited waiver of sovereign immunity reflected in the enactment of the FTCA was never intended to allow claims to be brought based on an alleged failure to follow internal agency guidelines or manuals. (Def.'s Mem. at 5). Citing this Court's decision in Harper v. United States, the government argues that like the Postal Service, the NPS cannot be held to a higher standard of care simply because it has adopted internal guidelines and procedures. 949 F. Supp. 130, 134 (E.D.N.Y. 1996). In Harper, the court found that the Postal Service could not be held liable for failing to follow the U.S. Postal Service Handbook relating to the placement of mats during bad weather. Id. (noting that under New York law, "an internal rule of a governmental entity cannot create a higher standard of care than that established by the prevailing law"); see also Lesser v. Manhattan & Bronx Surface Transit Operating Authority, 157 A.D.2d 352, 355-56, 556 N.Y.S.2d 274, 276 (1st Dep't 1990) (holding that even though the bus company manual instructed drivers to warn people to

17

watch their step when boarding and to keep the bus steps free from snow, it was error to allow the jury to hold the bus company to a higher standard of care than required by law); Crosland v. N.Y.C. Transit Authority, 68 N.Y.2d 165, 168-69, 498 N.E.2d 143, 144, 506 N.Y.S.2d 670, 671 (1986); Caputo v. N.Y.C. Transit Authority, 86 A.D.2d 883, 447 N.Y.S.2d 535, 536 (2d Dep't 1982).

Plaintiff contends that the government misconstrues his argument. Rather than claiming that the Gateway Manual imposes a higher standard of care upon the defendant, plaintiff asserts that the government, by following the procedures set out in the Gateway Manual, voluntarily assumed the duties therein. (Tr. at 12-15). According to plaintiff, the Manual and the testimony of NPS lifeguards Steve Snapper and Cristen Mullen relating to the NPS procedures for sandbar detection serve as evidence of the daily procedures and practices that NPS officials voluntarily follow. (Id.; see Snapper Dep. at 13-14; Mullen Dep. at 7-8). Plaintiff contends that had the government followed its own internal procedures, the sandbar would have been detected and his injury avoided. (Pl.'s Mem. at 15 (citing Cosgrove Aff. ¶¶ 11, 12)).

The government contends that it did in fact follow its internal guidelines,[14] and that in any event, the lifeguards' testimony regarding these procedures was very limited and fails to provide a basis for finding an assumed duty to warn. Specifically, Ms. Mullen's testimony was limited to the admission that lifeguards were trained to be aware of sandbars, explaining that "usually . . . in the morning we'll be swimming out there, you will see the sandbar, you will feel the sandbar." (Mullen Dep. at 8). Lieutenant Snapper testified that lifeguards were trained to be aware of

---

[14]Cristen Mullen testified that on the morning of the accident she swam in the area to monitor the underwater conditions but discovered no sandbars. (Mullen Dep. at 17).

swimmers who wander onto sandbars and are unable to swim back. (Snapper Dep. at 13). When asked if there was a "concern of people striking themselves against sandbars in shallow water," Lieutenant Snapper responded that it "might be a possibility" in "very high surf conditions." (Id.)

Plaintiff, however, argues that because there was a sandbar present, Ms. Mullen must have been negligent in failing to detect its presence. (See Tr. at 18). Even assuming for purposes of this motion that there was a sandbar present at the time of the plaintiff's accident, and that the government, through its Manual and procedures, assumed a duty to detect its presence, plaintiff has not shown any basis for finding a duty to warn. Neither of the lifeguards testified that there were procedures they were expected to follow to warn people against diving when there was a sandbar observed during the course of the morning ocean inspection. Thus, even if plaintiff can establish that the lifeguards were negligent in failing to note the presence of the sandbar, plaintiff has failed to present any evidence that the government voluntarily assumed a duty to warn under these circumstances. More important, plaintiff has failed to demonstrate that he relied to his detriment in some way on the defendant's conduct.

In Tavarez v. Lelakis, the Second Circuit held that under New York law, an assumed duty of care arises only when (1) the failure to exercise due care increases the risk of harm to the plaintiff or (2) the harm is suffered because of plaintiff's reliance on the defendant's undertaking giving rise to an assumed duty. 143 F.3d 744, 747 (2d Cir. 1998) (citing Restatement (Second) of Torts § 323 at 137, comment c (1965)); see also Wendy Hong Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83, 94 (E.D.N.Y. 2000) (holding that in order to establish liability under an assumed duty theory, New York law requires plaintiff to demonstrate that (1) plaintiff reasonably

relied on defendant's assumption of a duty, and (2) defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing); Ward v. Edinburg Marina Inc., 293 A.D.2d 887, 888-89, 741 N.Y.S.2d 304, 306 (3d Dep't 2002) (noting that where an assumed duty may arise from negligent words or acts that induce reliance, the issue is whether defendant's conduct has placed another in a more vulnerable position than he or she would have been in had the defendant done nothing); Castiglione v. Village of Ellenville, 291 A.D.2d 769, 770, 738 N.Y.S.2d 443, 445-46 (3d Dep't 2002) (holding that "a duty arises from the voluntary performance of an act only if the defendant's conduct can be shown to have placed the plaintiff in a more vulnerable position than the plaintiff would have been in had the defendant refrained from undertaking the act").

In Heard v. City of New York, the plaintiff was seriously injured when he dove off a jetty into shallow water at Rockaway Beach in Queens. 82 N.Y.2d 66, 72, 623 N.E.2d 541, 544, 603 N.Y.S.2d 414, 417 (1993). Moments before the dive, a lifeguard had ordered plaintiff and his companions to leave the jetty. After repeating the order, the lifeguard, in the face of plaintiff's resistance, finally acquiesced and the plaintiff dove in, injuring himself. The court rejected plaintiff's argument that the lifeguard voluntarily assumed a duty to prevent him from diving, noting that "[t]he issue is causality – in short, not what defendant could have prevented but what defendant proximately caused by inducing reliance." 82 N.Y.2d at 72, 623 N.E.2d at 544, 603 N.Y.S.2d at 417. Citing its earlier decision in Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d 507, 522, 407 N.E.2d 451, 429 N.Y.S.2d 606 (1980), where the plaintiff had claimed that the defendant was negligent in failing to provide a lobby attendant in the building on the night the plaintiff was shot, the court in Heard stated:

> We suggested [in <u>Nallan v. Helmsley-Spear, Inc.</u>] that the assumed
> duty theory would have been viable if defendant's prior conduct (i.e.,
> the provision of an attendant on other nights) had foreseeably led
> plaintiff to change his own conduct – for instance, by giving him a
> false sense of security. In such an instance, defendant's actions could
> properly be deemed to be a legal cause of plaintiff's harm.

<u>Heard v. City of New York</u>, 82 N.Y.2d at 72-73, 623 N.E.2d at 544, 603 N.Y.S.2d at 417.

In finding no such causal connection in <u>Heard</u>, the court reasoned that the plaintiff was in no worse position once the lifeguard acquiesced in allowing him to dive than if the lifeguard had stood by and done nothing. The court stated: "in looking at plaintiff's evidence under an assumed duty theory, we conclude as a matter of law that the lifeguard's failure to insist that Heard leave the jetty was not a breach of duty proximately causing Heard's injuries." <u>Id.</u> at 73, 623 N.E.2d at 544, 603 N.Y.S.2d at 417. But see <u>DeVeau v. United States</u>, 833 F. Supp. 139 (N.D.N.Y. 1993) (finding an assumed duty where the defendant placed mats near the entrance of the post office on a rainy day, creating "what appeared to be a safe, dry place for customers to enter the post office," but in fact creating a dangerous condition in that plaintiff stepped between the mats and slipped on the vinyl floor); <u>Lawson v. State of New York</u>, 207 Misc. 542, 544-45, 139 N.Y.S.2d 525, 527-28 (Ct. Cl. 1955) (finding an assumed duty where plaintiff in diving into designated diving area detrimentally relied on park signage indicating water was six feet deep when it was actually only three and one-half feet deep).

In this case, plaintiff has not presented any evidence to suggest that the government's actions placed the plaintiff in a more vulnerable position than he would have been in had the procedures not been in place, nor has he presented any evidence to suggest that his reliance on the government's procedures led him to dive when he did. He does not contend that he knew

that the NPS regularly checked for sandbars and therefore thought it was safe to dive. He also does not contend that he was forced to forego some opportunity to avoid risk as a result of the government's assumed duty. Simply stated, had the government no established practice of checking for sandbars at Riis Park, plaintiff would still unfortunately be in the same position that he is today.

Accordingly, the Court finds that plaintiff has failed, as a matter of law, to establish that the government should be held liable under a theory of assumed duty.

### 3) Actual or Constructive Notice

In a further attempt to distinguish the instant case from <u>Herman</u> and the precedents holding that there is no duty to warn of the presence of sandbars on the ocean floor, plaintiff contends that under New York law, the government can be held liable because it had actual or constructive notice that sandbars posed a hazard to bathers at this particular beach. (Pl.'s Mem. at 16 (citing <u>Melian v. City of New York</u>, No. 83 CV 3935, 1988 WL 86685, at *1 (E.D.N.Y. Aug. 17, 1988), and <u>Lawson v. State of New York</u>, 207 Misc. at 544-45, 139 N.Y.S.2d at 527-28). Specifically, plaintiff contends that the court in <u>Herman</u> provided for an exception to the general rule that exempts property owners from liability based on a failure to anticipate a danger posed by the "natural, shifting conditions" of the ocean floor. The court stated that "[t]o be liable in damages for failure to warn of a dangerous condition, a property owner must have notice of the condition itself as well as the unreasonable risk it creates." 63 N.Y.2d at 823, 472 N.E.2d at 25, 482 N.Y.S.2d at 249. Plaintiff contends that this exception should apply here because defendant knew of the dangers posed by sandbars and knew or should have known of the

existence of this particular sandbar as a result of the morning inspection. Therefore, plaintiff argues that defendant had a duty to warn bathers not to dive in that area.

In support of this argument, plaintiff cites to the provisions of the Gateway Manual and the procedures followed by the lifeguards in their daily swim inspection that make it clear that the government had actual or constructive notice of the hazards posed by sandbars, their transitory nature, and the need to monitor the beachfront on a daily basis to detect their presence.[15] In addition, plaintiff cites the report of his expert, Steve Cosgrove, who represents that it is the industry custom for ocean bathing beach facilities to detect and warn bathers of hazardous underwater conditions such as sandbars. (See Pl.'s Mem. at 6-8; Cosgrove Aff. ¶¶ 4-8). In his report, Mr. Cosgrove opines that, "[i]t is well recognized within the local and national beach safety/administration industry that, as underwater conditions at an ocean beach change daily, the lifeguards at an ocean beach are required to be constantly aware of these changing situations, including hazardous surf conditions and obstructions, such as sandbars." (Cosgrove Aff. ¶ 5). Mr. Cosgrove further states that "[t]hese industry standards, including standards promulgated by the Consumer Products Safety Commission in its reports on Aquatic Safety Signage and the American National Standards Institute ("ANSI") [in its reports on] facilities warning signage, require that upon the location of a submerged surf hazard/obstruction,[16] an

---

[15]As noted above, however, the specific section in the Manual that refers to sandbars addresses the drowning hazard posed to non-swimmers who venture out onto sandbars and are unable to swim to shore when the tide changes. It makes no reference to the dangers posed by diving into a sandbar. Similarly, the other two sections of the Manual recognize the need to be vigilant about the potential for rapidly changing conditions in the tide, current, and configuration of the ocean floor, but again there is no mention of the danger of diving into sandbars.

[16]Absent any evidence to the contrary, and for purposes of deciding this summary judgment motion, the Court accepts Mr. Cosgrove's assertion that the Consumer Products Safety

23

ocean bathing beach facility post signs warning of the underwater condition, and prohibiting potentially hazardous activities, such as bathing, wading or diving in the area of said hazardous condition."[17] (Id. ¶ 8).

Mr. Cosgrove opines on industry custom as it applies to ocean bathing beach facilities generally. Such standards also apply to the United States government in determining the reasonable standard of care. See 28 U.S.C. § 1346(b)(1) (providing that claims under the FTCA derive from "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); 28 U.S.C. § 2674 (stating that the federal government is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances"); see also Arizona Maint. Co. v. United States, 864 F.2d 1497, 1504 (9th Cir. 1989) (finding that industry standards established government's duty of care in seismic testing case where government did not use minimum safe distance from structure for dynamite charge).

Plaintiff argues that because there was a sandbar present at 1:00 p.m. on the day of his accident, Ms. Mullen should have detected that sandbar if she had been acting reasonably, and in accordance with industry custom, should have provided a warning. According to plaintiff, once the sandbar was – or should have been – detected, a duty to warn arose, and the government's

---

Commission and the American National Standards Institute intended to include sandbars as examples of "hazardous surf conditions or obstructions" or "submerged hazard[s]/obstruction[s]" in their reports on "facilities warning"/"aquatic safety" signage.

[17]Mr. Cosgrove also relies on the Gabrielson Study, which he describes as "another excellent reflection of the relevant industry standards," in support of the proposition that all ocean beaches must post signs reflecting the standard of care with respect to entering shallow water in an ocean environment. Specifically, he asserts that signs must be posted prohibiting running and diving into shallow surf. (Cosgrove Aff. ¶ 13).

failure to post such a warning not only violated industry standards but was also the proximate cause of plaintiff's injuries.

In moving for summary judgment, the government did not directly address the plaintiff's argument that this case falls within the exception set out in Herman where the landowner has actual or constructive knowledge of the dangerous condition, nor did the government present any expert testimony to refute the position taken by plaintiff's expert. Instead, the government noted that "neither parties' [sic] respective expert opinions are relevant to defendant's motion for summary judgment, which is based solely on the law." (Def.'s Reply Mem. at 9-10 n.2). Thus, in the absence of any contrary expert opinion, Mr. Cosgrove's expert opinion is undisputed and it appears that the industry standards as applied to the NPS require a warning to beach patrons when a dangerous condition is detected. Although the parties dispute whether there was in fact a sandbar present on the date of the accident, and whether Ms. Mullen should have detected its presence, the standard for summary judgment requires the Court to "draw all factual inferences and resolve all ambiguities in favor of the nonmoving party." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d at 436. Thus, the Court assumes for purposes of this motion that a sandbar was present at the location of plaintiff's injury on the day of the accident and that had the lifeguards followed the established procedures, they would have or did discover the sandbar. Indeed, as Ms. Mullen stated, if one actually swims the area where there is a sandbar, "you will see the sandbar, you will feel the sandbar." (Mullen Dep. at 8). Thus, assuming that the government is subject to the industry standards cited by the expert, a duty to warn would have

arisen.[18] Under these circumstances, the Court concludes that there are material issues of fact in dispute as to whether the government had actual or constructive knowledge of this sandbar, giving rise to a duty to provide a warning consistent with industry standards. Resolving all disputed issues of fact in favor of plaintiff, the Court cannot find as a matter of law that the government owed no duty of care to Mr. Brown.

### 4) Proximate Cause

The government contends that even if the NPS had a duty to warn of the presence of sandbars, plaintiff's claim must nonetheless fail as a matter of law because the government's failure to warn was not the proximate cause of his injuries. Proximate cause is defined as "that which in a natural sequence, unbroken by any new cause, produces [an] event and without which that event would not have occurred." Rider v. Syracuse Rapid Transit Ry. Co., 171 N.Y. 139, 147, 63 N.E. 836, 838 (1902). Under New York law, when the plaintiff's actions intervene between the defendant's conduct and the plaintiff's injury, the defendant is not liable in negligence when the "intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, [because] it may well be a superseding act which breaks the causal nexus." Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169 (1980).

---

[18]The Court finds this case distinguishable from the decisions in Herman and McCullough, where the courts found no duty to detect and warn. Unlike those cases, plaintiff here has submitted Mr. Cosgrove's expert report suggesting a duty based on industry standards. This type of evidence and the testimony of the lifeguards, which suggests that they were, as part of their daily routine, required to patrol the beach and swim the area in part to determine whether there were any hazards present, do not appear to have been considered in these other cases.

Whether a plaintiff's conduct is extraordinary or unforeseeable, and therefore a superseding cause, is generally an issue of fact for the jury to decide. Id. at 315, 414 N.E.2d at 670, 434 N.Y.S.2d at 170. However, the question of legal cause may be decided as a matter of law where only one conclusion can reasonably be drawn from the facts given. This generally occurs in cases involving independent intervening acts that "operate upon but do not flow from the original negligence." Id. The government argues that such is the case here, relying on Caraballo v. United States, 830 F.2d 19 (2d Cir. 1987) (holding that plaintiff's conduct was a superseding cause barring all liability from attaching to the United States where plaintiff dove head-first off an abandoned pier into observably shallow water and struck his head on the bottom of Jamaica Bay).

Under the facts presumed in light of the inferences to be drawn under the summary judgment standard, however, Caraballo, is clearly distinguishable from the instant case. There, the plaintiff dove head-first off a pier four and one-half feet above the water, into water which the district court found was clearly only two and one-half to three feet deep. Id. at 20, 23. In this case, plaintiff claims that he dove horizontally in a surface dive in waist-deep water. The facts, therefore, are sufficiently distinguishable for the Court to find that Caraballo is not controlling in this case.

Plaintiff argues that the act of diving into shallow water is not so unforeseeable as to constitute a superseding cause to relieve a landowner of liability for the negligent failure to warn that an area is unsafe for diving and he relies on the court's holding to that effect in Ziecker v. Town of Orchard Park, 75 N.Y.2d 761, 551 N.E.2d 99, 551 N.Y.S.2d 898. In Ziecker, the plaintiff ran into water until it reached his knees and then dove forward into water only two to

27

two and one-half feet deep. <u>Ziecker v. Town of Orchard Park</u>, 147 A.D.2d at 974, 538 N.Y.S.2d at 671. In rejecting the Appellate Division's conclusion that the plaintiff's conduct was the sole proximate cause of his injuries, the Court of Appeals found "sufficient evidence in the record from which the jury could have rationally concluded that plaintiff was not aware of the depth of the water at the point he would reach on his dive, and, accordingly, that plaintiff's conduct was not . . . a superseding act absolving defendant from liability." <u>Ziecker v. Town of Orchard Park</u>, 75 N.Y.2d at 763, 551 N.E.2d at 101, 551 N.Y.S.2d at 900.

In other similar cases, the New York courts have declined to find as a matter of law that diving was a superseding cause. "In swimming and diving injury cases, courts have held that a plaintiff's lack of awareness of the water's depth is enough to deny a defendant's summary judgment motion on the issues of recklessness and causation." <u>Paulison v. Suffolk County</u>, 775 F. Supp. 50, 54 (E.D.N.Y. 1991) (finding that the question of whether diving off a tree could be considered an unforeseeable superseding event was a triable issue of fact where the injured party alleged that he had no knowledge of the depth of the water at diving spot and had witnessed others swimming and diving there without incident). <u>See also</u> <u>Melian v. City of New York</u>, No. 83 CV 3935, 1988 WL 86685, at *1 (E.D.N.Y. Aug. 17, 1988) (distinguishing <u>Caraballo</u> in finding that the water was not so obviously shallow or the sandbars so apparent that plaintiff's dive off of a jetty at Rockaway Beach was an unforeseeable superseding cause of his injuries), <u>aff'd</u>, 902 F.2d 1557 (2d Cir. 1989); <u>Coe v. Ta-Ga-Soke Campgrounds, Inc.</u>, 162 A.D.2d 980, 981, 557 N.Y.S.2d 207, 207-08 (4th Dep't 1990) (reversing summary judgment because "it could not be said as a matter of law that the diver's conduct was reckless or that it was the superseding cause of his injury" where plaintiff was injured when he dove into a shallow creek from a dock

28

on or adjacent to defendant's premises); Kriz v. Schum, 75 N.Y.2d 25, 35-36, 550 N.Y.S.2d 584, 589-90, 549 N.E.2d 1155, 1160-61 (1989) (finding that summary judgment was improperly granted to defendant because plaintiff's conduct in sliding headfirst into the shallow end of defendant's pool was not an unforeseeable use of the slide to constitute the sole legal cause of her injuries). But cf. Boltax v. Joy Day Camp, 67 N.Y.2d 617, 620, 490 N.E.2d 527, 528, 499 N.Y.S.2d 660, 661 (1986) (finding reckless conduct of plaintiff was an unforeseeable superseding event where plaintiff was an experienced swimmer, knowledgeable about the general dangers of diving, who admitted his familiarity with the various water levels at each part of the pool and yet chose to dive head-first from a lifeguard chair into the shallow end).

In light of the New York courts' reluctance to grant summary judgment on this issue and given that there is a dispute as to the depth of the water in which the accident occurred, the Court cannot find as a matter of law that plaintiff's shallow surface dive was a superseding intervening cause of his injuries. Accordingly, defendant's motion for summary judgment is denied.

## CONCLUSION

As set forth above, genuine issues of material fact exist as to whether the government had actual or constructive knowledge of the existence of the sandbar and whether it breached a duty to warn of the presence of that sandbar at Riis Park. Accordingly, the government's motion for

29

summary judgment is hereby denied.  A conference is scheduled for November 26, 2007 at 11:00

a.m. to discuss a schedule for the preparation of the pretrial order.


**SO ORDERED**

Dated: Brooklyn, New York
      October 23, 2007

Cheryl L. Pollak
United States Magistrate Judge