UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ROBERT BROWN,

                    Plaintiff,                    **MEMORANDUM**
                                                  **AND   O R D E R**

        - against -                               04 CV 3938 (CLP)

UNITED STATES OF AMERICA,

                    Defendant.
-----------------------------------------------------X

On September 13, 2004, plaintiff Robert Brown filed this action against the United States

of America (the "government"), pursuant to the Federal Tort Claims Act, 28 U.S.C. §§

1346(b)(1), 2671-80 ("FTCA"), alleging that the government's negligence in operating,

controlling, and managing the beach at Jacob Riis Park ("Riis Park") caused plaintiff to suffer

serious injuries during a diving accident on July 26, 2003. On September 19, 2006, the parties

consented to the undersigned for all purposes including entry of judgment. On December 12,

2006, the government moved for summary judgment, seeking to dismiss plaintiff's claims in

their entirety, arguing that: (1) under New York law, the government had no duty to warn of the

presence of sandbars on the ocean floor; and (2) even assuming the existence of such a duty, the

government's failure to warn was not the sole, proximate cause of plaintiff's injuries. (See

Def.'s Mem. at 2, 11-13). The Court denied the government's motion.

Following denial of the motion, the parties proceeded to trial before the undersigned,

commencing on July 14, 2008. The parties thereafter submitted post-trial briefs addressing

various legal and factual disputes. Having heard the testimony of the witnesses and reviewed the

parties' respective submissions, the Court finds in favor of defendant.

## FACTUAL FINDINGS

It is undisputed that Riis Park, located in the Jamaica Bay Unit of Gateway National Recreation Area in Queens, New York, is owned and operated by the United States. (Tr.[1] at 623). The park fronts the Atlantic Ocean and is administered by the National Park Service ("NPS" or Park Service"), a unit of the United States Department of the Interior. (Id. at 885-904; Def.'s Mem.[2] at 3; Pl.'s 56.1 Stmnt[3] ¶ 1; Def.'s 56.1 Stmnt[4] ¶ 3).[5]

At trial, plaintiff Robert Brown testified that he was born on June 17, 1974, and that in

---

[1]Citations to "Tr." refer to pages in the trial transcript.

[2]Citations to "Def.'s Mem." refer to the defendant's Memorandum of Law in support of its motion for summary judgment, dated December 12, 2006.

[3]Citations to "Pl.'s 56.1 Stmnt" refer to the plaintiff's Rule 56.1 Statement filed on February 15, 2007.

[4]Citations to "Def.'s 56.1 Stmnt" refer to the defendant's Rule 56.1 Statement filed on December 13, 2006.

[5]In his Complaint, filed on September 13, 2004 ("Compl."), plaintiff alleges that the accident occurred at Riis Park Beach, property owned and operated by the government. (Compl. ¶ 5). Although the government admits in its Answer, dated November 17, 2004 (Answer ¶ 5), that it owns and operates Riis Park and the beach there, the government contends that the area in which plaintiff suffered his accident falls within an area actually owned by the City of New York. (See testimony of James M. Pedowitz, Esq., Tr. at 894-95). Since the government did not pursue this argument when moving for summary judgment, the Court did not consider this argument at the time. Although the government presented credible testimony from an expert in support of its position that the government is not responsible because the incident occurred on City property (see discussion infra at 20-21), the Court has not reached this issue because it finds that it lacks subject matter jurisdiction and, in any event, it finds that there was no sandbar present at the time of the accident.

July of 2003, he was attending school to become an Emergency Medical Technician ("EMT").

(Tr. at 43). On July 26, 2003, he and his girlfriend,[6] Michelle Berrio, visited the beach at Riis

Park, arriving around 12:00 to 12:30 in the afternoon.[7] (Id. at 43-44). Upon arriving at Riis

Beach, the couple set up a blanket, approximately 200 feet from the water,[8] in the middle of the

beach, between the two jetties, one a wooden jetty and one made of "concrete rocks." (Id. at 43-

44, 77-78). At the time, there was a lifeguard on duty there, seated in a raised chair. (Id. at 44,

78). According to plaintiff, the day was a "beautiful beach [d]ay," the waves were "friendly,"

and there was a nice breeze. (Id. at 51-52). The beach was crowded and there were a lot of

people in the water. (Id. at 63, 68; see also Tr. at 110). After sitting on the beach for an hour,

plaintiff and Ms. Berrio walked straight ahead toward the water where they stood at the shore.

(Id. at 44-45, 47, 78). Plaintiff invited Ms. Berrio to go into the water with him, but she refused

because the water was cold. (Id. at 45, 47, 79). After she refused, plaintiff "just took off,"

---

[6]There is a dispute as to whether Ms. Berrio was Mr. Brown's fiancé or girlfriend. Mr. Brown testified that at the time of the accident, Ms. Berrio was his fiancé, and Marianne Sawyer, the EMT who responded to the accident, testified that the woman on the scene who provided information regarding the plaintiff identified herself as the plaintiff's fiancé. (Tr. at 43, 601-03, 615-17; Pl.'s Ex. 12-A) (Citations to "Pl.'s Ex." refer to exhibits offered by plaintiff and admitted into evidence at the trial). Ms. Berrio, who is currently employed as a social worker for the City of New York, Human Resources Administration (id. at 75), testified at trial that although she had previously been engaged to Mr. Brown, they were not presently living together, nor was she his fiancé when the accident occurred; they were then and now just "boyfriend - girlfriend." (Id. at 76). At the time of the trial, Ms. Berrio admitted that she had a relationship with plaintiff and wanted to help him. (Id. at 118-19).

[7]Ms. Berrio testified that they arrived at Riis Beach at approximately 11:30 a.m. (Tr. at 78).

[8]Although Mr. Brown testified at trial that the blanket was between 100 and 200 feet from the water's edge, he conceded that during his earlier deposition, he had stated that it was 200 feet from the water. (Tr. at 44-45, 61-62).

running a "little to the right but straight ahead" into the water to get over the initial shock of the temperature. (Id.) Ms. Berrio did not run in with him at that time. (Id. at 64-65). When he left Ms. Berrio to enter the water, she was approximately 25 steps from the edge. (Id. at 64). He testified that there were other people on the beach and in the water when he ran into the water. (Id.)

Mr. Brown admitted that he knew how to swim; indeed, on cross-examination, he testified that he had taken a three week course of swimming lessons while in high school, but the lessons were in a swimming pool. (Id. at 56-57, 69). He estimated that he had been to the beach approximately ten times, "at least." (Id. at 47). He further testified that although he had probably been to Riis Park Beach when he was "real young,"[9] he had not been there while an adult. (Id. at 46, 59). He testified that he had gone to Rockaway Beach, once or twice a summer, between the ages of 7 and 15. (Id. at 16, 58).

As he took off running toward the water, plaintiff saw a man ten to fifteen feet in front of him, so he swerved out of the man's way to avoid bumping into him. (Id. at 47). He testified that he ran approximately 20 feet into the water, at a slight angle to the right, where the water was "up to my knees midthigh" and "just jumped in." (Id. at 79, 129-30; see also Tr. at 142-43). He testified that he executed a running dive, face down, until he was "submerged, took one stroke . . . [and] hit my head on, you know, and my head jumped back." (Id. at 47-48). During this testimony, plaintiff gestured, indicating that he took a breast stroke with his hands in front

---

[9]On cross-examination, he conceded that during his deposition, he had previously testified that he had been to Riis Park "sporadically" when he was "10, 12, 13" years old and then "[m]aybe once a year" after he was 12. (Id. at 61).

going to the sides. (Id. at 48). In describing the way he dove into the water, plaintiff testified that "as the water was slowly increasing up to, up to my knees, midthigh,[10] I just laid down sort of a dive, like a little dive, not no [sic] swan dive . . . I just went parallel with the water to cut the water, and once I went into the water you know I made my stroke." (Id.) He testified that when making the stroke, his body "was submerged, I was underwater." (Id.) After he hit something, his body went limp and he had no "function of my lower half extremities and my upper body was starting to, like deplete." (Id. at 49). When asked to describe what he hit, he was not specific except to say that it was "soft but firm." (Id. at 56). He testified that it seemed like he was underwater for an "eternity" because he could not get to the surface. (Id. at 49). Eventually, he reached the top but could not get his face out of the water. (Id.) He was, however, "flailing with [his] hands." (Id. at 50).

According to Ms. Berrio, plaintiff ran about 20 feet or so into the water before he dove forward. (Id. at 130). She described his hands being out in front of him in a diving position at the time he dove forward and cut through the water. (Id. at 81). When he dove in, she could still see the blue shorts he was wearing but she could not remember exactly how much of his shorts she could see. (Id. at 82). She testified that he "dove in, cut through the water and he disappeared for a while and it took a little too long," but she believed that he was swimming underwater. (Id. at 79). According to Ms. Berrio, plaintiff disappeared for 20 to 30 seconds, and

_____

[10]On cross-examination, he was asked whether he ran in until the water was "knee high," to which he responded, "knee-thigh." (Id. at 66). He then admitted that during his deposition, he had testified that when he ran into the water, he ran in until it was "knee high." (Id.) On redirect, he indicated that the water was approximately three inches above his knee. (Id. at 71). Plaintiff testified that he is approximately six feet, one inch tall. (Id. at 67).

then came out of the water a little further from where he dove in; she expected that he would have surfaced "a lot further out" because she thought he was swimming. (Id. at 82). When he came up, his arms were "flailing," "doing a butterfly almost." (Id. at 79-80). She testified that he couldn't pick his head up and would not stand up so she and another man right by her in the water darted out towards him. (Id. at 80).[11]

Ms. Berrio testified that as she ran out to plaintiff, she noticed that the water got a little deeper and then when she got to plaintiff, the water was "a lot more shallow and it was like a slope, like I had to climb up in, you know, like your feet are digging in the sand." (Id. at 83). Ms. Berrio testified that at its deepest point, the water was around her "legs, my hips" and that when she reached the plaintiff, the water was at the level of her "knees towards the calf or so," "between my knees and my calf." (Id. at 83-84). She described it "like a little hill;" she testified that she had to dig in her feet in order to get up the slope. (Id. at 100). When asked to describe how high the sandbar was she testified that it was approximately 22 inches. (Id. at 131-32). This contradicted the statement contained in her affidavit that said it was "'at least three feet higher than the bottom.'" (Id. at 133). Specifically, she stated: "'The area I was standing on when I reached Robert was atop this slope of sand that was three feet higher than the bottom a few feet away and not rock, wood or another hard object.'" (Id. at 134). She testified that plaintiff could not have hit the bottom "because he didn't like, dive off of anything. He didn't dive down. He

---

[11]There is a dispute as to whether Ms. Berrio pulled plaintiff out of the water, as she testified (see Tr. at 82-83), or whether he was pulled out by two men. (Id. at 171-72, 174-75, 191, 195, 199). Ms. Berrio's testimony that she pulled him out of the water is contradicted by plaintiff's own testimony that he saw her running towards him when he was in the water, which would have been difficult if, as he testified, he could not get his face out of the water. (Id. at 82-83, 67).

like, dove parallel. He cut through the water." (Id. at 139).

According to plaintiff, there were no warning signs at the beach telling people not to dive and no warnings regarding the existence of a sandbar. (Id. at 54). Plaintiff also testified that the lifeguard never said anything about sandbars or warned against diving in the water. (Id. at 100). Ms. Berrio confirmed that she did not see any warning signs about diving into the water or about sandbars. (Id.) According to plaintiff, he was not aware of the risk of hitting his head on a sandbar, and he had never heard of that happening before the accident. (Id. at 55). He further testified that he did not even know sandbars existed. (Id.) On cross-examination, plaintiff conceded that when swimming at Rockaway Beach, the sand underneath the waves was not always flat and he conceded that he had experienced the waves pulling the sand out from under his feet and sinking a bit. (Id. at 58-59).

Ms. Berrio testified that when plaintiff was pulled from the water, she called plaintiff's name, but he "was out, he was blue" and he had a red dot in the middle of his forehead, like a bruise. (Id. at 85). Plaintiff, on the other hand, testified that upon being pulled from the water, he told Ms. Berrio that he was okay, but he "was slowly going to like a sleepy mode." (Id.) He testified that he could not stand or hold himself up; "I was just laying there." (Id. at 51). After some time, other lifeguards arrived. (Id. at 53). The lifeguard, who Ms. Berrio described as a "teenager," came over but did not ask what happened. (Id. at 85-86). Another man with gray hair suggested "'[m]aybe it was a stinger,'" which he explained as "maybe it just hit his head and he's like paralyzed or shocked. It will go away in a half hour or so." (Id. at 86).

On cross-examination, counsel for the government questioned Ms. Berrio about an EMT

report that was prepared in connection with the accident. (Id. at 102). The report indicated that the EMT worker was speaking to the plaintiff's "fiancee" and that the reported mechanism of injury was listed as: "'Patient went headfirst into surf and hit jetty.'" (Id.) Although Ms. Berrio said she could not recall telling the EMT worker that she was plaintiff's fiancee (id. at 107), she did admit that she spoke to the EMT worker. (Id. at 103). She denied telling the EMT worker that plaintiff hit his head on a sandbar because "[she] didn't know what happened." (Id. at 104). In fact, she conceded that she did not know what a sandbar was. (Id. at 105). She heard people around her say that he might have hit a jetty. (Id. at 105).

Ms. Berrio testified that approximately two weeks after the accident, she returned to the beach with members of plaintiff's family and plaintiff's lawyer. (Id. at 113-15). No one took a camera and Ms. Berrio could not recall anyone going into the water to look for a sandbar. (Id. at 116, 117-18). She also denied ever discussing with the attorney the possibility that plaintiff hit his head on a "wood piling." (Id. at 123). She did concede that plaintiff was strong, "well-built," and could run pretty fast. (Id. at 124-25).

Christin Mullen, employed as a surf guard for the government for eight summers, testified that in 2003 she was working at Riis Park as a surf guard. (Id. at 148). Prior to becoming employed with the government, she received training from the lieutenants at Riis Park during her first summer in 2001. (Id. at 149). During the course of the training, she received a copy of the Gateway National Recreation Area Lifeguard Manual (the "Lifeguard Manual"), and became familiar with its contents. (Id. at 149-50; see Gvt. Ex.[12] C). In addition to the Lifeguard Manual,

---

[12]Citations to "Gvt. Ex." refer to exhibits offered by government and admitted into evidence at the trial.

she was trained to determine if a person was in distress in the water and how to handle the situation. (Tr. at 150). She also received training in locating sandbars and not to let people swim out to them. (Id. at 150-51). She denied ever hearing about people who sustained injuries after running into the water and hitting their head on a sandbar. (Id. at 151). She did concede that she was aware that people could become injured in the water other than through drowning. (Id. at 154). Among other things, the Lifeguard Manual refers to "Beach Hazards," and warns: "'The surf guard must constantly be aware of rapidly changing situations and conditions. You will have to become familiar with the beach at each individual area in order to be effective and to prevent water accidents.'" (Id. at 156).

On July 26, 2003, Ms. Mullen testified that she arrived at work at 10:00 a.m. (Id. at 157). She testified that lifeguards are not on duty until that time. (Id. at 194). That day she was assigned to Bay 7/8 which had a concrete jetty on the right as one faced the water and a jetty made of wood pilings on the left. (Id. at 158-59; Pl.'s Ex. 16B). Ms. Mullen testified that on the beach, the lifeguards had an elevated chair approximately six or seven feet high, which was located closer to the concrete jetty. (Tr. at 160-61; Pl.'s Ex. 16A).

According to Ms. Mullen, when she arrived at the beach on the morning of July 26, 2003, she worked out for the first two hours, swimming and running. (Id. at 161-62; 194). She also set up the lifeguard chair by putting out the buoys or torps in the sand. (Id. at 162-63). That morning she walked down to Bay 4, about three and a quarter to a half mile away, and then she swam from Bay 4 to Bay 15, which takes approximately 20 minutes to a half hour. (Id. at 163, 166-67). During the swim, the guards assess the water conditions; if there is a sandbar, they

would notice the sandbar. (Id.) According to Ms. Mullen, she would swim approximately 20 yards out into the water. (Id. at 167). She testified that she did not notice any unusual sand conditions during her swim that day, nor did she observe any sand elevations on the floor in the area of Bay 7 that day. (Id. at 194, 197).

She also did not observe patrons "going up and down in the water in the surf" in the vicinity of Bay 7, nor did she observe any people having problems with the conditions in the Bay 7 area. (Id. at 198). She testified that she had been trained, by looking at the waves breaking and ripples in the area, to determine whether a sandbar was present. (Id. at 176). On that day, she saw nothing that indicated the presence of a sandbar in the area. (Id.)

She also denied ever seeing a two to three foot sandbar close to the shore at Riis Park Beach. (Id. at 199). She conceded that she was aware of other incidents where people had suffered paralysis as a result of diving into the ocean, but not into sandbars. (Id.) She further testified on cross-examination that "[i]f there had been a two- to three-foot high sand configuration on the ocean floor in the swimming area," she would have noticed it. (Id. at 195).

She testified that she did not go into the water to look for sandbars. (Id. at 169). At her deposition, she testified that during the swim, she would check out the underwater conditions, but that there were no sandbars. (Id. at 170). When asked to explain this apparent discrepancy, she testified that while she was swimming, she would "realize, yes, if there was a sandbar there," but there was no sandbar that day. (Id. at 170).

After swimming to Bay 15, the lifeguards then jogged back to Bay 7, finishing somewhere between 10:45 and 11:00 a.m. (Id. at 168). According to Ms. Mullen, plaintiff's

accident occurred at approximately 12:25, just after low tide. (Id. at 195). Ms. Mullen conceded that she did not actually see the accident occur, but first became aware of it when she noticed people pulling plaintiff from the water. (Id. at 171). She testified that she saw two men pulling plaintiff out of the water (id. at 171, 195); she later saw a young lady with the plaintiff but did not speak to her. (Id. at 171). At the time she saw plaintiff being pulled from the water, he was in the middle of the bay between the two jetties. (Id. at 172). He was on his back, facing the sky, with his head closer to the shore and his feet aiming toward the ocean. (Id. at 200).

Although she did not ask anyone what had happened, she immediately called for assistance by whistling to the next chair double time, meaning "respond[] quickly," before even going to the area to help. (Id. at 172, 196). Soon after Ms. Mullen arrived, approximately one to two minutes later, Lieutenant Steven Snapper arrived and took over, rendering assistance to plaintiff, holding his neck stable. (Id. at 177-78, 196). Although she did not question either of the two men who pulled plaintiff from the water or the woman that was present, Ms. Mullen told Lieutenant Snapper that the plaintiff might have been having a seizure. (Id. at 179). She was then instructed to return to her chair because other people were still swimming. (Id. at 179, 197). Eventually, a few EMTs arrived and placed plaintiff on a backboard and transported him to the EMS station. (Id. at 180-81). After the EMTs took plaintiff away, Lieutenant Snapper conducted an inspection of the bottom of the ocean in the area where the incident occurred. (Id. at 182).

According to Ms. Mullen, the day was very calm, the waves were small, a foot to two feet, and there was nothing unusual going on. (Id. at 182-83). No one at the time of the accident

mentioned that there were any unusual or dangerous sand conditions in the water. (Id. at 197). Ms. Mullen testified that at the location where plaintiff was pulled out of the water, it was "approximately up to my knees." (Id. at 195). She further testified that Mr. Snapper went out no more than 20 feet to a point where the water was midthigh to waist. (Id. at 183). According to Ms. Mullen, the lieutenant searched the area where they pulled plaintiff out of the water, but he did not search the entire Bay. (Id.)

When asked if the lifeguards have the responsibility to post red flags when the beach was closed, Ms. Mullen testified that the supervisors in charge make that decision. (Id. at 184). She further testified that there are no signs on the beach that say "No diving" nor has she ever been instructed to warn bathers not to dive because of the risk of hitting a sandbar. (Id. at 184-85). She conceded that on a daily basis she has observed people run into the water and dive headfirst. (Id. at 189). She also testified that she was familiar with the permanent sandbar that is located off the beach about 300 feet out and she can see the waves breaking over it. (Id. at 186; Pl.'s Ex. 11-B). However, she testified that other than the permanent sandbar 300 feet off shore, she had never seen another sandbar off the shore of Riis Beach. (Tr. at 180, 201-02). She further testified that if she noticed a sandbar, she would not warn anyone of its existence. (Id. at 189).

On cross-examination, Ms. Mullen described a sandbar as "when the bottom of the ocean rises up offshore and usually waves break further offshore and that's a sandbar; and usually, you have to swim out a little bit before you get to the sandbar." (Id. at 193). With respect to any training she received as a lifeguard, Ms. Mullen testified that her training was focused on preventing people from swimming out to sandbars in the first place because they get tired

swimming out and then cannot make it back in against the tide, running the risk of drowning. (Id.)

Lieutenant Steven Snapper testified that on July 26, 2003, he was employed as a surf guard for the NPS as "acting lieutenant." (Id. at 206). He had been a lifeguard for 26 summers at Riis Park. (Id. at 210). One of his functions was to ensure that the lifeguards were performing their duties. (Id. at 207). He did not witness the accident involving Mr. Brown, but rather arrived at the scene approximately five minutes later, after receiving a whistle signal from Ms. Mullen. (Id. at 207, 228). At the time, he was one lifeguard chair over, less than a hundred yards away. (Id.) He agreed that the day was calm, with no waves, and no high winds. (Id. at 208). By the time he arrived, Mr. Brown was already on the ground but Lieutenant Snapper claimed that he was the first person to actually attend to the plaintiff by holding his neck in place. (Id. at 209). Shortly after he arrived, the EMTs arrived. (Id.)

Lieutenant Snapper testified that he has seen probably hundreds, even thousands of people run into the water and dive in headfirst. (Id. at 211). He further stated that he has noticed sandbars in the vicinity of the Bays of Riis Park Beach. (Id. at 212). He is not aware of any prior incident at Riis Park, however, where a person struck a sandbar and sustained cervical injuries. (Id. at 220). After he arrived, Lieutenant Snapper conducted an inspection of the accident site, which he described to be the western half of the Bay. (Id. at 226). He testified that he walked out about 25 feet into the water, reaching a depth of about "two and a half feet to three feet of water." (Id. at 226-27). Through this inspection, Lieutenant Snapper was looking for "[a]ny type of underwater object or submerged object." (Id. at 231). He testified that he did not find

anything. (Id.) Lieutenant Snapper did not recall anyone suggesting that the plaintiff struck a jetty. (Id. at 227).

On cross-examination, Lieutenant Snapper agreed that his "immediate concern" after arriving at the accident scene was to ensure the safety of the plaintiff. (Id. at 237). In response to repeat questioning, he reiterated that he did not "observe anything of any significance" during his inspection of the accident site. (Id. at 239). He further noted that none of the bystanders identified any unusual or dangerous sand conditions. (Id.) Nor did anyone in the area report any unusual or dangerous beach conditions that entire day. (Id.)

Marianne Sawyer testified that since July 2001, she has been employed by Trans Care and currently holds the position of EMS supervisor for the General Hospital in Harlem. (Id. at 614). In July 2003, she was employed as an EMT by the NPS, stationed at Riis Park Beach, and she worked in that capacity for two summers. (Id. at 598, 615). According to Ms. Sawyer, there is an EMT station in Bay 5 located at Riis Park Beach, where she reported on a daily basis. (Id. at 615).

On July 26, 2003, the day of Mr. Brown's accident, Ms. Sawyer received a lifeguard signal and responded to Bay 7 where she saw plaintiff lying on the sand. (Id. at 600). She prepared an NPS patient-care form based on information provided by a woman who identified herself as plaintiff's fiancee. The report indicated "Past Medical History." "Denies per fiancee;" "allergies, denies per fiancee;" and "fiancee states positive loss of consciousness." (Pl.'s Ex. 12-A). Ms. Sawyer testified that she received that information from Mr. Brown's fiancee. (Tr. at 617). Ms. Sawyer explained that in filling out the report, she tried to get demographics from the

14

patient and, if possible, information as to how the accident occurred, either from the patient, a bystander or whoever brought the patient in. (Id. at 616).

Although the report states that "Patient went headfirst into surf and hit jetty," Ms. Sawyer could not recall who gave her that information. (Id. at 604; Pl.'s Ex. 12-A). She conceded that she may have put that on the report simply because she overheard people behind her saying it but she did not identify them in the report. (Tr. at 604). It was not her practice to record the names of the bystanders. (Id. at 616). The report also stated: "Patient complained of pain to his back, secondary to being knocked down in surf and he hit jetty." (Id. at 606; Pl.'s Ex. 12-A). When questioned about this sentence at her deposition, Ms. Sawyer indicated that the information came from a bystander, but at trial, she testified that if she wrote "patient complained of," then the information came from the patient. (Tr. at 608). However, she testified that three years after the fact, she had no independent recollection. (Id.)

According to Ms. Sawyer, no one reported that Mr. Brown was injured from striking a sandbar or she would have recorded that information. (Id. at 617-18). Ms. Sawyer further testified that during the time she was working at Riis Park, she had not seen reports of injuries due to sandbars. (Id. at 618).

Barry Sullivan was called to testify by plaintiff's counsel. He testified that he has been the general superintendent of Gateway National Recreation Area since January 2005, and that his duties include the management and operation of Riis Park Beach. (Id. at 623). Mr. Sullivan identified a document entitled "Management Policies 2006" ("NPS Management Policies"), which he testified applied to the beaches operated by the NPS. (Id. at 624; Pl.'s Ex. 33). He also

indicated that he was familiar with the Lifeguard Manual and that it had been updated since 1997. (Tr. at 634). Although Mr. Sullivan indirectly supervises the lifeguards, he testified that he had no responsibility for drafting NPS policies or drafting the Lifeguard Manual. (Id. at 637).

According to Mr. Sullivan, the lifeguards, as part of their routine, do both beach and water inspection, prior to opening for the day. (Id. at 640). The beach does not actually close, but the lifeguards are not on duty until 10:00 a.m. (Id.) He testified that he did not know whether the lifeguards are trained to check the ocean bottom configuration. (Id. at 643). He further testified that there is no government policy to warn bathers of the risk of running into a sandbar when diving headfirst into the water (id. at 646), nor is he aware of any government publication that contains such a warning. (Id. at 651). However, Mr. Sullivan conceded that he had observed people diving into waves. (Id.) Mr. Sullivan also conceded that the Park Service publishes a brochure which is distributed at visitors' centers but not at beach access sites. (Id. at 700-01). He also testified that there are no signs at the beach warning about sandbars or diving,[13] but there are signs designed to protect the piping plover. (Id. at 647, 701). When asked if he was aware of sandbars at Riis Park, Mr. Sullivan testified that he was aware of an offshore bar that is

---

[13]Plaintiff offered a page from an internet website of the United States Navy, which contained various safety warnings for swimmers and beach goers, including the admonition to enter the water feet first, and not to dive, because sandbars can be shallow. (Pl.'s Ex. 32). The government objected to the admissibility of this exhibit, arguing that plaintiff had never disclosed the document prior to trial; the government had not had an opportunity to explore the exhibit with its witnesses; and, in any event, the exhibit was not relevant to the obligations and duties of the Park Service. The Court reserved decision on the admissibility of the Navy website. (Tr. at 691-92). Having reviewed the exhibit, the Court admits it into evidence but concludes that it is immaterial to the outcome of this case because, as set forth infra at 43-48, the Court finds that the plaintiff hit his head on the bottom of the ocean, not on a sandbar, and thus there is no need to decide whether the government had a duty to warn in this case.

semi-permanent, approximately 300 to 400 feet off the shore that moves very infrequently. (Id. at 647).

Mr. Sullivan testified that NPS.gov is the official website of the NPS (id. at 695; Pl.'s Ex. 32), and he identified a document from the Gulf Islands National Seashore site,[14] noting that it has a separate website from Gateway National Recreation Area, which he identified as www.NPS.gov/GATE. (Tr. at 696). Although the witness acknowledged that the Gulf Islands site had a warning on its website that states: "no diving, sandbars can be shallow, feet first first time," the witness testified that he had only heard those words during testimony at the trial the day before. (Id. at 697). Mr. Sullivan further testified that what is published on this website is "not a National Park Service policy." (Id. at 698).

Mr. Sullivan testified that he was aware of the United States Lifesaving Association ("ULSA") but did not know of any provisions in its manual that the government recognizes or adopts as its policies. (Id. at 709). He testified, however, that the government recognizes the Lifesaving Instructor ("LSI") certification from the American Red Cross in hiring lifeguards. (Id. at 712-13).

On cross-examination, Mr. Sullivan was asked to examine Section 8.2.5.1 of the NPS Management Policies, which indicates that the policies are not meant to impose park-specific visitor safety prescriptions but rather leaves public safety concerns to the discretion of the superintendents and decision makers at the park level to deal with within the confines of funding and staffing. (Id. at 718; Pl.'s Ex. 33, p. 251). Mr. Sullivan testified that, "according to

---

[14]The witness testified that the Gulf Island Seashore encompasses both Florida and Mississippi. (Id. at 697).

17

policies," they have no signs warning of sandbars, advising against diving or warning of shallow water; they do not post buoys or red flags on sandbars; the primary concern of lifeguards at Riis Park is to guard against drowning. (Tr. at 723). He testified that sandbars pose a drowning risk; people wade out through a deeper area to get to the sandbar and are cut off from the breach when the tide comes in. (Id. at 716). He testified that he is not required to follow tips from the Red Cross or lifeguard associations, or the policies established at state or city beaches. (Id. at 724). Nor is he required to follow the policies of any other national seashores because decisions as to the management of Gateway National Recreation Area are independent of the others. (Id.)

Stephen Prokop testified that he is Superintendent of Kalaupapa National Historic Park, located on the island of Molokai in Hawaii. (Id. at 849). Prior to his employment in Hawaii, he worked as a lifeguard for the NPS at Sandy Hook, which is part of the Gateway National Recreation Area. (Id. at 851). He worked as a lifeguard at Sandy Hook for one summer in 1976 and thereafter was a lifeguard at Golden Gate National Recreation Area from 1977 to 1987. (Id. at 851, 853). At Golden Gate, there was an ocean beach on the Pacific Ocean, with three designated swim areas, approximately a quarter to a half mile in length. (Id. at 853). According to Mr. Prokop, there were no signs warning of sandbars, or of the dangers of diving in shallow water. (Id.) Nor were there any buoys on the sandbars to mark the presence of sandbars even though "[m]ore often than not," sandbars were present. (Id.) From 2001 to 2004, Mr. Prokop served as Chief Ranger at Whiskeytown National Recreation Area in Northern California. (Id. at 851).

While at Whiskeytown, Mr. Prokop supervised the lifeguards on Whiskey Lake. (Id.)

18

According to Mr. Prokop, there were no tides, waves, or cross currents on the Lake, but there was a designated swimming area, marked by buoys and ropes "to keep the public, primarily children and non-swimmers in a confined area." (Id. at 852). After Whiskeytown, Mr. Prokop became Chief Ranger for the Cape Cod National Seashore, which consists of 40 miles of open ocean and beaches. (Id. at 854). During his first summer, he supervised 45 lifeguards; now there are over 50. (Id.) According to Mr. Prokop, there are sandbars off the shores of Cape Cod depending on the wave action and whether there are storms. (Id. at 855). However, Mr. Prokop testified that the primary concern of the lifeguards is "poor swimmers being tempted to go out to the shallow water offshore." (Id.) With regard to "ridges and runnels," which Mr. Prokop described as "undulations or uneven bottom," he testified that he had encountered them on Cape Cod but never put buoys on them; nor were there signs warning of sandbars or against diving in shallow water either at the beach or in pamphlets. (Id. at 856-57). He explained that if buoys or floats were used, they would have to be attached to the bottom by some kind of anchor, which created its own hazard in terms of children playing with them or being struck by the float. (Id. at 857). He further described the runnels and ridges as "a friend of families with young children. They don't have to take them out further into deeper water where the [surf] is breaking large." (Id. at 883). He testified that if the lifeguards were to close the areas in which these ridges and runnels appeared, "people would laugh at the lifeguards" because this is shallow water and it is where they want the children to be.[15] (Id.)

---

[15]Mr. Sullivan testified that in a high surf condition the lifeguards might close the beach, but would not do so if there were only small waves, with ridges and runnels forming; otherwise, the beach would be closed all the time. (Id. at 722).

On cross-examination, Mr. Prokop admitted that he had seen buoys used as a warning device to demarcate swimming areas in the ocean, and to keep boats out of a swimming area. (Id. at 860). However, he stated that he had never seen a buoy used as a warning device for some underwater condition, be it a sandbar, in-shore hole or undulation on the ocean floor. (Id.) He further testified that the only severe neck injury that he could recall during the 22, almost 23, years that he was at Golden Gate occurred when someone was body-surfing and the wave broke right on the beach. (Id. at 861). He testified that he had heard of someone who jumped headfirst and hit their head on the bottom; "it's rare but it does happen." (Id. at 862). He further testified that if someone dives down "deep," an undulation or sandbar could present a hazard. (Id. at 863). He further explained that it is similar to diving down at a severe angle in a pool and striking the bottom. (Id. at 865). He described it as "a high risk activity" and stated that it is "relatively uncommon to see someone do that because the bottom is so irregular, it's a risk to do something like that." (Id. at 865). He testified that "[e]ven if it's your first time at the beach you can determine pretty quickly the depths of the water as you enter the water by just seeing the wave action . . . ." "You can get a pretty good idea of the depths of the water." (Id. at 868). He described a sandbar as "a potential risk, . . . I mean minimal risk but potentially yes." (Id. at 873-74).

He further testified that based on Mr. Brown's testimony that he was fully submerged and took a stroke underwater after diving in two feet of water, that what he was describing was not a shallow superman dive; "that's a deep dive. That's not a shallow dive." (Id. at 875). He testified that as a lifeguard if he sees someone "tearing into the water that's a red flag . . . . It's a

macho type of a thing that we see at the beach and its not a good thing." (Id. at 878). He further

testified that based on common sense, looking at other people in the water, an individual could

tell the depths of the water. (Id. at 926). He also indicated that for a lifeguard to whistle to a

person about to run and dive into shallow water would require the lifeguard to anticipate the

person's actions. (Id. at 928).

On cross-examination, Mr. Prokop was shown a copy of a Departmental Manual from the

U.S. Department of the Interior, containing the NPS Director's Orders 50(b) and Reference

Manual 50(b), Occupational Safety and Health Program. (Id. at 916; Pl.'s Ex. 35). When asked

if he was familiar with the section in this Manual relating to providing educational materials to

alert the public of potential dangers, the witness admitted being familiar with the policy but

indicated that the NPS does not warn about the risk of running in the water and diving. (Id. at

920).

James Pedowitz, Esq. testified that he had been a real estate attorney for 70 years,

admitted to the bar in 1938. (Id. at 885-86). During the course of his career, he dealt with real

estate titles, working for a title insurance company for more than 43 years, eventually joining the

firm of Rosenman Colin.[16] (Id. at 887). According to Mr. Pedowitz, one of his responsibilities at

the title company was to examine the titles of people who owned waterfront estates. (Id. at 888).

When shown the Gateway Deed from 1974, he testified that at that time, the City of New York

conveyed land to the United States, excluding Parcel Number 12, which the witness testified

excluded land under water. (Id. at 889-90; Def.'s Ex. E, F-1). Among the areas depicted on the

---

[16]The firm is now Katten Muchin Rosenman, LLP.

map and in the Deed was Riis Park. According to the witness's professional experience and opinion, the United States does not own the land under the water in front of Riis Park because the land under the water up to the mean high water mark was excluded in the Deed. (Id. at 893). The mean high water line was fixed as of 1910 irrespective of where the ocean is due to accretion or erosion of land. (Id. at 892). Thus, since according to plaintiff's expert, the accident occurred just below the mean high water line, Mr. Pedowitz opined that the accident occurred on land owned by the City of New York and not on government land. (Id. at 894).

Francis A. Cosgrove was called as an expert witness by plaintiff. He testified that he received a Master's degree in physical education and recreation administration from Columbia University and that he teaches as a adjunct professor at Long Island University, C.W. Post Campus, where he teaches graduate level courses in management and public administration. (Id. at 253). Prior to retiring in 1995, he served as senior deputy commissioner of parks for Nassau County, a position he held for 25 years. (Id. at 250). In that position, he had direct management operations responsibilities for all of Nassau County's "active parks," including marinas, beaches, playgrounds, and ball fields. (Id.) With respect to the beaches, Mr. Cosgrove explained that he was responsible for the ocean beaches, such as Nassau Beach, on the south shore of Nassau County, and the Harbor Beach or calm-water beach on the north shore of Long Island. (Id. at 251). As part of his responsibilities, he worked with the lifeguards of the Nassau County Beach, now renamed Nickerson Beach. (Id. at 251, 257). He testified that during his 25 years, there were no drownings or "major aquatic related accidents or injuries." (Id. at 252).

Mr. Cosgrove testified that beginning in 1971, he was recruited to set up a new

22

department because at the time, the Department of Recreation and Parks did not exist. (Id. at 259). One of the first things he did was to hire a lifeguard captain to manage Nickerson Beach, as well as to hire a cadre of qualified men and women lifeguards to set up the beach for the summer. (Id. at 260). The lifeguard captain initially settled a labor dispute involving the lifeguards and he hired professional people to help organize and run the beaches. (Id. at 261).

During his tenure as deputy commissioner, Mr. Cosgrove developed a risk management plan to determine and assess risks, and tracked all of the accidents and incidents that occurred to make any necessary corrections or improvements. (Id. at 254). He also taught staff members of the NPS at Floyd Bennet Field. (Id.) He testified that although he trained as a lifeguard, he never became one, and never had the practical experience of sitting in the lifeguard's chair. (Id. at 255-56). He explained, however, that he was ultimately responsible for making decisions regarding staffing levels and new equipment, and he was consulted regarding hazards on the beach, including sandbars, tidal surges, sludge dumps, oil spills, and post-hurricane tides. (Id. at 262). Mr. Cosgrove testified that it was part of his overall responsibility to put up signage at Nickerson Beach. (Id. at 257).[17]

He testified that during his tenure, there were sandbars at the beach. When asked to define a "rip tide," Mr. Cosgrove testified that it was formed by a flow of waves towards the shore that creates a longitudinal movement across the shoreline. (Id. at 256). If it breaches a sandbar, it can create a funnel effect that could pose a drowning hazard. (Id.) Mr. Cosgrove testified that the way to determine if there is an "in-shore" sandbar is to walk in and it should be

---

[17]Over defendant's objection, the Court found Mr. Cosgrove qualified to render an expert opinion in beach management. (Id. at 264-65).

obvious. (Id. at 267). He testified that he was familiar with the dangers that can occur when people run into the water, and dive in shallow water. (Id. at 268). He testified that at Nickerson Beach, if there was a sandbar and it was low tide, the areas would have been "flagged," with a red flag or the lifeguards could have walked the beach with bull-horns asking the public to move away from areas that they considered unsafe. (Id. at 268, 287-88). He further testified that as part of their daily practice, his lifeguards would conduct running and swimming drills designed to determine and assess the conditions of the surf. (Id. at 269). Once those conditions were determined, precautions would be taken if necessary to secure the area by putting up red flags and closing sections of the beach to swimming. (Id.)

Mr. Cosgrove explained that the "gold standard" organization for lifeguard procedures was the USLA, a national organization dedicated to ocean and surf lifeguards and to educating the public. (Id. at 269-70). According to Mr. Cosgrove, the USLA sets guidelines which include the "ten commandments" followed by his lifeguards. (Id. at 270; Pl.'s Ex. 29). The ninth commandment is "Don't dive headfirst. Protect your neck." (Tr. at 273-74; Pl.'s Ex. 29). The USLA public information brochure also contains guidelines that advise against running into the water and diving. (Tr. at 274; Pl.'s Ex. 29). Among other things, the brochure provides "Spinal injury avoidance tips," which include a admonition against diving headfirst into "any unknown water," or diving "toward the bottom into oncoming waves." (Tr. at 276; Pl.'s Ex. 29). Finally, the brochure also advises: "Stop, watch and walk into the water," as opposed to running into the water. (Tr. at 276; Pl.'s Ex. 29).

The USLA also produced a brochure reflecting a presentation made by Mr. William

24

Richardson, then President of the USLA, during an International Lifesaving Federation Conference in 1997, which discusses waves and the formation of waves, in-shore holes and sandbars. (Tr. at 279-81; Pl.'s Ex. 29c). According to Mr. Cosgrove, his lifeguards relied on the standards set forth in this brochure in setting policies and practices. (Tr. at 284-84). He further testified that these are considered to be "accepted standards of practice" in the industry with respect to beach management and lifeguarding. (Id. at 284). He also testified that although he could not recall a specific incident in which someone ran into the water and struck their head on a sandbar, "it is a recognized hazard in the industry." (Id. at 288). He opined that the warnings of the USLA should be made available and posted on beaches for beach-goers. (Id. at 289). He also testified that if a sandbar existed 25 to 30 feet off the shore, the lifeguards should have been aware of it and should warn the public of its existence. (Id. at 291).

On cross-examination, Mr. Cosgrove conceded that there were no signs at Nickerson Beach warning of the danger of sandbars or diving into sandbars either currently or back when he was operating the beach. (Id. at 291-92). When asked about whether Lido Beach or Jones Beach had signs warning about sandbars, Mr. Cosgrove admitted that they did not. (Id. at 294-95, 298). Similarly, the beach operated by City of Long Beach had no such warning signs even though Mr. Cosgrove opined that "Long Beach has a very good public information program." (Id. at 298). Mr. Cosgrove conceded that each of these other beaches did not meet his standards. (Id. at 298-99).

When asked if he was familiar with the work of Dr. Alexander Gabrielson on diving injuries, Mr. Cosgrove acknowledged that before his death, Dr. Gabrielson, who taught at New

York University, was an eminent scholar and well-respected professor. (Id. at 299). In fact, Mr. Cosgrove had served as part of an editorial review committee for one of Dr. Gabrielson's publications. (Id. at 263). In Dr. Gabrielson's book, *Research Findings and Recommendations For Reducing Catastrophic Injuries*, it was noted that of 161 injuries studied, only 0.6% had resulted when an individual made a running dive into the ocean; one possible explanation for the minimal number of such accidents noted by Dr. Gabrielson was that: "[our] public ocean beaches are well managed and that people who are injured in surf diving are reluctant to file a lawsuit." (Id. at 300; Gvt. Ex. H-3). Dr. Gabrielson further noted that 74.3 % of additional ocean diving injuries occur when people dive off piers, docks or jetties. (Id.) Dr. Gabrielson also noted that: "Diving into the ocean by running from the beach and launching oneself headfirst into a wave can be dangerous if the dive is too shallow and the wave breaks down on the diver. When diving into the ocean, one should dive through an incoming wave, not under it." (Id. at 301; Gvt. Ex. J-2).

When asked how he would determine whether a sandbar is a danger, Mr. Cosgrove testified that it depends on the location of the sandbar, noting that in-shore sandbars at low tide pose a hazard. (Id. at 314). When show a photograph of the off-shore sandbar at Riis Beach and asked when, if ever, he would close the beach, the witness said he needed additional information regarding the depth of the water for fear that a swimmer could get trapped out there. (Id. at 317-18). However, he would not close the beach with a red flag based on that sandbar. (Id. at 318). When asked about the height that a sandbar would have to be before the beach should be closed, Mr. Cosgrove testified that it "[c]ould be any height," even if it was only six inches. (Id.) When

shown photographs of a ridge and runnel system, he testified that he did not have enough information to assess whether he would close the beach under those conditions. (Id. at 323-31; Gvt. Ex. K-1-K-5). He further testified that the photographs did not accurately depict the scenario described to him in this case. (Id. at 332).

Mr. Cosgrove conceded that if the beach had an average slope of 1 in 16 and the plaintiff started in ankle deep water and ran into the water for 20 feet, he would be in about a foot of water which would be about knee deep. (Id. at 336-37). Mr. Cosgrove also conceded that the National Recreation and Park Association, a parks and recreation advocacy organization, is an "excellent" professional organization. (Id. at 338). He further agreed with the analysis that accident statistical data is the yardstick to consider when measuring where an agency's time and money should be targeted. (Id. at 339).

On re-direct, Mr. Cosgrove indicated that the best way to educate the public is at the location where they enter the facility or beach area. (Id. at 345). He testified that, in his opinion, the government should hand out pamphlets to all beach-goers, regardless of what language they speak and whether there are, as counsel represented, 6,500 miles of beaches and 5 million visitors to the Cape Cod beaches alone during a year. (Id. at 368-69).

Dr. Peter Rosen testified that he is a coastal geologist, with a business located in Hinghah, Massachusetts, and an associate professor at Northeastern University in Boston, teaching marine geology, coastal processes, sedimentation, environmental planning and environmental science. (Id. at 380, 383). He received his Master's Degree in geology and research from the Coastal Research Center at the University of Massachusetts, writing his thesis on beach processes in

Nantucket. (Id. at 381). He obtained a Ph.D from the Institute of Marine Sciences, College of William and Mary, conducting research on beach processes in the Virginia Chesapeake Bay. (Id.) He also conducted post doctorate work on beach processes in eastern Canada. (Id.) He is a member of a variety of professional organizations related to geology and he has a number of publications on beach processes. (Id. at 382). He testified that he had been called to testify as an expert in wetland hearings and DEP hearings. (Id. at 383).

According to Dr. Rosen, he spent ten to 15 days studying the processes at Riis Park Beach, including one day inspecting the actual beach itself for three to four hours on a winter morning in February 2008. (Id. at 383-86). He conceded that the conditions could be different depending on whether it was summer or winter, and that the sea levels and waves change from time to time. (Id. at 386). He testified that prior to investigating the beach, he reviewed the depositions of a number of witnesses, including Mr. Brown, Ms. Berrio, and Mr. Cosgrove. (Id. at 390). He learned that there was a ridge and runnel system at the time of the accident and that Mr. Brown entered into relatively shallow water and dove forward, pulled his hands back in at least one stroke and contacted an object on the bottom. (Id.) From Ms. Berrio's testimony, he determined that she ran out into three foot deep water and had to step up a sandy ridge that sloped three feet into shallow water one foot deep. (Id. at 391). This was significant to Dr. Rosen because it described a landward side of a ridge and runnel system. (Id.) He testified that migrating features that are inshore are ridge and runnel systems as compared with the offshore or "long shore bar" which is stationary. (Id. at 393). He explained that waves and weather conditions cause sand to move through water. (Id. at 394).

28

According to Dr. Rosen, the major mechanics of transport is the rip current which carries the sand offshore where it is deposited. (Id.) A rip current occurs when a storm wave pushes so much water against the shoreline that it forms a high velocity channel of water that pushes the shoreline away. (Id. at 395-96). He testified that rip currents are very effective at transporting sand from shoreline and building up the offshore bar. (Id. at 396). The ridge is the topographically lower part of the ridge and runnel which is generally lower than the land on both sides. (Id. at 397). During a storm, when sand is transported during high wave energy, large volumes of sand can be transported seaward in a short period of time. (Id.) Migration of a ridge on shore takes place very slowly over a matter of weeks and in tidal areas, such as Riis Beach, the migration tends to take longer than in a non-tidal area. (Id.) He explained that over time, sand will migrate landward, adding to the volume of beach. (Id. at 420). Based on his examination of the beach at issue, Dr. Rosen concluded that it undergoes the normal patterns of ridge and runnel migration. He further testified to the presence of a ridge, which was exposed at low tide, that was in the process of welding to the shore. (Id. at 424).

Based on Ms. Berrio's testimony, Dr. Rosen testified that he believed that she described walking across a runnel and then stepping up to a migrating ridge. (Id. at 427). He then testified about ridge migration, opining that given the possible weather on the day of the accident, combined with his own calculations, that the ridge could have moved several inches between 10:30 a.m. and 1:00 p.m. on the day of the accident. (Id. at 431). Dr. Rosen continued by testifying that a sandbar of white sand, the type present at the accident site, would have been visible under one foot of water. (Id. at 433). He added that ridge and runnel systems typically

are hundreds of feet long and if one was present at Bay Seven, it likely would have extended into Bay Six and Bay Eight. (Id. at 435). Dr. Rosen then testified about his examination of the accident site, including the slope of the beach and the condition of the sand. (Id. at 437). He also discussed migration patterns and mean tide calculations. (Id. at 443-49).

On cross-examination, Dr. Rosen conceded that he made a "credibility finding" regarding Michelle Berrio's testimony, "giv[ing] credibility" to her statements. (Id. at 499). Dr. Rosen then admitted that he had neither met Ms. Berrio nor does he know anything about her other than what is contained in the report. Further, he admitted that he is unaware of her reputation for truthfulness (id. at 500), and agreed that she "[p]ossibly" could have a bias given her close relationship to the plaintiff. (Id. at 501). When asked why Dr. Rosen did not credit Lieutenant Snapper's testimony, Dr. Rosen responded that Ms. Berrio was present at the moment the accident occurred. (Id. at 505). However, Dr. Rosen then admitted that since sandbars are slow moving, if Lieutenant Snapper searched the accident location, he would have found any sandbar that was present when Ms. Berrio entered the water. (Id. at 505).

Dr. S. Jeffers Williams testified for the government. (Id. at 539). He testified that he inspected the accident site on January 10, 2003, and did not see a ridge and runnel system, although he did not go into the water. (Id. at 539, 572). At that time, he observed waves of two to three feet in height. (Id. at 572). Dr. Williams then discussed wave formations and their impact on sand, specifically noting that high waves take sand off-shore. (Id. at 540-42). He explained that higher waves cause erosion, which is eventually transported into the water to create a sandbar. (Id.) Then, when the waves decrease in height, the bar will slowly migrate to

shore. (Id.) Dr. Williams then discussed littoral drift, a phenomenon whereby waves interact with the shoreline to transport sediment in a parallel direction. (Id.)

Dr. Williams, in contrast to Dr. Rosen's assertion, stated that the amount of ridge and runnel drifting is too speculative to generalize and that a 14 inch per day drift may not be accurate. (Id. at 546). Dr. Williams testified that the sand on Riis Beach was firm. (Id. at 549). In fact, Dr. Williams had observed a boy riding a bike on the Riis beach sand with no apparent difficulty. (Id). He described the beach as a having a fairly flat slope on the day of his visit, with waves between one and three feet. (Id. at 550).

When questioned, Dr. Williams conceded that he did not take any pictures of the accident site. (Id. at 558). He recalls the sand being hard and the berm of the beach located at the high water mark, which is landward of the jetties. (Id. at 559). He agreed that there is some evidence that low waves transport sand back towards shore. (Id. at 562). He further testified that sandbars are very common in the area of the accident. (Id. at 567). Upon examining Dr. Rosen's pictures of the accident site, he agreed that the picture shows a ridge and runnel partially welded, or attached, to the beach. (Id. at 569). He opined that before the ridge and runnel became welded to the beach, it likely was underwater beyond the shoreline. (Id. at 569). He further testified that ridge and runnel systems are sometimes visible under the water depending on the clarity of the water and the color of the sand. (Id. at 570). According to Dr. Williams, the sand at the accident site was light colored. (Id. at 572).

With regard to his expert report, Dr. Williams agreed that the only opinion he gave with regard to the cause of the accident was that the sand was hard and he would not be surprised that

one would be injured by diving and hitting their head on the bottom. (Id. at 577). When pressed, Dr. Williams admitted that he based his conclusion that the plaintiff hit his head on the bottom largely on the fact that the sand was hard at the accident site. (Id. at 580). Although he considered the possibility of a migrating ridge and runnel system, he found no evidence of such a system. (Id. at 580). Moreover, even though Ms. Berrio could have described a ridge and runnel system, Dr. Williams maintains that the plaintiff hit his head on the bottom of the seabed. (Id. at 583, 586). Dr. Williams also testified that a trained lifeguard would likely be able to see a sandbar located 20 to 35 feet offshore under conditions similar to those present on the day of the accident. (Id. at 589-90).

## DISCUSSION

### A. Sovereign Immunity

Defendant's first argument is that plaintiff's claims are barred by the discretionary function exception to the FTCA.

#### 1) The Discretionary Function Exception

The FTCA constitutes a limited waiver of the government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); see United States v. Orleans, 425 U.S. 807, 813 (1976). Under the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), the court lacks subject

matter jurisdiction to hear an FTCA claim if the government's acts or omissions were discretionary. See, e.g., Fazi v. United States, 935 F.2d 535, 537 (2d Cir. 1991) (citing Dalehite v. United States, 346 U.S. 15, 30-36 (1953)). This is true "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, even though Congress consented to a waiver of sovereign immunity through the FTCA and authorized suits for damages to be brought against the United States for the negligence of its employees "in the manner and to the same extent as a private individual under like circumstances," id. § 2674, the waiver was a limited one. The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States," United States v. Varig Airlines, 467 U.S. 797, 808 (1984), and represents a Congressional desire to protect governmental activities that involve official acts of discretion, Berkowitz v. United States, 486 U.S. 531, 536 (1988), where "there is room for policy judgment and decision." Dalehite v. United States, 346 U.S. 15, 35-36 (1953).

In determining whether the exception applies, courts apply a two-step analysis. First, courts determine if the challenged governmental act or omission involved discretion on the part of the actor. United States v. Gaubert, 499 U.S. 315, 322-28 (1991). Relevant to this inquiry is whether the rules and regulations applicable to the conduct at issue require an exercise of "an element of judgment or choice." Id. at 322. "If there is a federal statute, regulation, or policy that dictates a specific course of action for a government employee to follow 'then there is no discretion in the conduct for the discretionary function exception to protect.'" Brotman v. United States, 111 F. Supp. 2d 418, 423 (S.D.N.Y. 2000) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)).

Second, courts consider whether the conduct was "grounded in [considerations of] social, economic and political policy." United States v. Gaubert, 499 U.S. at 323. To determine whether this prong is met, courts focus not on the intent of the government employee in exercising the discretion, but rather "on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 323-25. This is because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy." Id. Moreover, courts have made it clear that there is no "need [to] ask whether government actors decided the point explicitly or actually discussed it, for the inquiry hinges on whether some policy justification could have undergirded the challenged conduct." Shansky v. United States, 164 F.3d 688, 692 (1st Cir. 1999); see also Gotha v. United States, 115 F.3d 176, 180 (3d Cir. 1997) (holding that "[t]he test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion") (internal quotations omitted); Kiehn v. United States, 984 F.2d 1100, 1105 (10th Cir. 1993) (holding that government officials need not "make an actual 'conscious decision' regarding policy factors" because it is "irrelevant" if the decision was "a matter of 'deliberate choice' or a mere oversight") (citations omitted).

As an initial matter, a court must determine whether the challenged conduct involved an exercise of official discretion. United States v. Gaubert, 499 U.S. at 324. Once it has been determined that the challenged action was not "controlled by mandatory statutes or regulations," id. at 328, then a presumption arises that the agent's exercise of that discretion is grounded in policy. See Boldue v. United States, 402 F.3d 50, 62 (1st Cir. 2005); Fazi v. United States, 935

34

F.2d at 538; <u>Brotman v. United States</u>, 111 F. Supp. 2d 418, 425 (S.D.N.Y. 2000). As a result, plaintiff bears the burden of demonstrating that the particular conduct at issue is not susceptible to a policy related judgment. <u>Boldue v. United States</u>, 402 F.3d at 62; <u>Brotman v. United States</u>, 111 F. Supp. 2d at 425.

    2) <u>Analysis</u>

      a) <u>The Conduct is Discretionary</u>

Here, the government argues that the NPS' decisions over the management of the national parks, including decisions relating to the provision of safety measures, are clearly discretionary and that Congress has detailed this discretionary function in Title 16, Section 1 of the U.S. Code. This section requires the NPS to "promote and regulate the use of the Federal areas known as national parks" in such manner as "to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment in the same manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

In support of the argument that park safety policies are discretionary, the government cites Section 8.2.5.1 of the NPS Management Policies, entitled "Visitor Safety." (Def.'s. Post Hrg. Mem.[18] at 42-43). Section 8.2.5.1 reads, in relevant part:

> [D]iscretionary management activities may be undertaken only to
> the extent that they will not impair park resources and values . . . .
> These management policies do not impose park-specific visitor
> safety prescriptions. The means by which public safety concerns
> are to be addressed is left to the discretion of superintendents and
> other decision-makers at the park level who must work within the

---

[18]Citations to "Def.'s Post Hrg Mem." refer to the Defendant's Proposed Findings of Fact and Conclusions of Law, filed November 19, 2008.

> limits of funding and staffing. Examples include decisions about
> whether to install warning signs . . . .

Id. The plain language of Section 8.2.5.1 grants considerable discretion to NPS officials to

determine the best way to utilize park resources to ensure public safety. It recognizes that Park

Service officials must balance the need for specific safety precautions with the practical realities

of, among other things, budgeting, staffing, and preserving park resources. Id. To that end,

Congress determined that Park Service officials were in the best position to "work within" these

competing demands (see NPS Management Policies 8.2.5.1), and to exercise "an element of

judgment or choice" in deciding whether to require certain safety precautions, including warning

signs. See United States v. Gaubert, 499 U.S. 315 at 322.

Indeed, numerous courts have held that the government's decisions not to mark certain

hazards are insulated by the discretionary function exception. See, e.g., Shansky v. United

States, 164 F.3d 688 (finding failure to install handrail and to post warning signs in Hubbell

Trading Post, a national historic site managed by the NPS, fell within the discretionary function

exception); Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995) (holding that NPS

decisions as to visitor safety "necessarily involve[] an exercise of discretion"); Childers v. United

States, 40 F.3d 973, 976 (9th Cir. 1994) (finding exercise of discretion in decision not to mark

certain trail hazards), cert. denied, 514 U.S. 1095 (1995); Brotman v. United States, 111 F. Supp.

2d 418 (finding NPS decision not to post a warning sign at the Statue of Liberty to fall within the

discretionary function exception). Indeed, in Manns v. United States, the Coast Guard's decision

as to whether to mark sandbars was found to be discretionary. 945 F. Supp. 1349, 1351 (D. Ore.

1996) (holding that the Coast Guard has "substantial discretion" in marking sandbars).

In this case, the government presented the testimony of Barry Sullivan, Superintendent of

Gateway National Recreation Area, who testified that the NPS Management Policies were not

intended to impose park-specific safety prescriptions but left decisions regarding public safety in

the discretion of the decision makers at the park level. (Tr. at 718). According to Mr. Sullivan,

there is no mandated policy to warn bathers of the risk of diving headfirst into a sandbar, and no

requirement that signs be posted at Riis Park Beach warning of the dangers of diving. (Id. at

723). He was also unaware of any government publication that requires such warnings. (Id. at

651). Stephen Prokop, Superintendent of the Kalaupapa National Historic Park, echoed Mr.

Sullivan's testimony that no NPS policy or requirement existed that signs be posted as to the

dangers of sandbars or diving in shallow water. (Id. at 853). Given that plaintiff has failed to

demonstrate that the decisions of the NPS as to warning about sandbars or posting no diving

signs were "'controlled by mandatory statutes or regulations,'" Brotman v. United States, 111 F.

Supp. 2d at 423 (quoting Gaubert v. United States, 499 U.S. at 328), the Court finds the first

prong of the discretionary function exception test to be satisfied.

     b)  The Conduct is Susceptible of Policy Analysis

Under the second prong of the test, plaintiff must show that the challenged conduct was

not grounded in policy considerations. This inquiry does not examine the merits of the

government's decision not to post signs or issue warnings about sandbars; it simply asks if the

government's decision was susceptible to policy analysis. See Brotman v. United States, 111 F.

Supp. 2d at 425.

The decision of whether and where to post warning signs at the beach involves a

weighing of safety concerns with considerations of aesthetics and the need to preserve the park resources as well as concerns for cost and staffing issues. As the court in <u>Brotman</u> noted, "[t]his type of decision is not only grounded in policy concerns," but typifies the type of decisions that form the basis for the discretionary function exception. <u>Id.</u> at 426.

Here, the evidence demonstrates that the NPS and Riis Park officials considered the hazards posed by sandbars and made a policy determination to train and instruct the Park Service lifeguards as to the most prominent danger. Mr. Sullivan testified that "according to policies," the primary concern of the lifeguards at Riis Park Beach is to guard against drowning and to that end, the lifeguards are trained that sandbars pose a risk of drowning. (<u>Id.</u> at 716). Indeed, the Lifeguard Manual explicitly requires lifeguards to "be aware of sandbars" because sandbars lead to drownings through the formation of rip currents and the danger that swimmers may become stranded on a sandbar during high tide. (<u>See</u> Gvt. Ex. C). Stephen Prokop also confirmed that the main hazard posed by sandbars is the danger that "poor swimmers [will be] tempted to go out to the shallow water offshore." (<u>Id.</u> at 855).

Even plaintiff's expert, Francis Cosgrove, conceded that the findings of Dr. Gabrielson, who Cosgrove acknowledged was a well-respected scholar, demonstrated that there was a low incidence of diving injuries from running into the ocean, with only 0.6% of diving injuries caused when an individual made a running dive into the ocean. (<u>Id.</u> at 300). He also agreed that when an agency determines where to target money and time in adopting preventive measures, it considers accident statistical data. (<u>Id.</u> at 339). This confirms that the decision to post signs and issue warnings is a policy-based decision. The fact that there were no signs warning of the

dangers of diving into sandbars posted at Sandy Hook, or on Cape Cod or at the Golden Gate National Recreation Area in California suggests that other NPS officials had made a policy determination not to install such signage. Indeed, there were no signs posted at Nickerson Beach when Mr. Cosgrove was responsible for supervising the lifeguards, nor are there such signs currently posted there or at Long Beach, which is operated by New York City and which Cosgrove testified had "a very good public information program." (Id. at 298).

Thus, from the testimony, it seems clear that the government's challenged conduct, including its operation of the beach and its alleged failure to warn about the existence of the alleged sandbar, was "grounded in [considerations of] social, economic and political policy." United States v. Gaubert, 499 U.S. at 323; see also NPS Management Policies § 8.2.5.1 (noting that policies do not impose park-specific visitor safety prescriptions). The government has "substantial discretion" in deciding whether to mark sandbars, Manns v. United States, 945 F. Supp. at 1351, just as it has substantial discretion to warn of many other potential hazards. See, e.g., Childers v. United States, 40 F.3d 973, 976 (9th Cir. 1994); Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995); NPS Management Policies 2006 § 8.2.5.1 (noting that Park Service "decisions about whether to install warning signs" are discretionary). Here, there has been a policy determination made that the more serious danger is that of drowning. Thus, based on a balance between the need for a specific warning and the practical realities of operating a beach, including funding, personnel, and the overall safety plan that has been implemented, a policy decision was made not to post signs or otherwise warn of sandbars.

Indeed, numerous courts interpreting similar guidelines have found that the discretionary

39

function exception bars an action under the FTCA for injuries suffered by patrons of NPS facilities based on allegations of deficient safety precautions. See, e.g., Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997) (relying on the discretionary function exception to bar suit where toddler fell into a fire pit on a campground, noting that in the absence of regulations, statutes or administrative policies mandating the "specific manner" in which campsites were to be maintained, the decisions of the Forest Service as to such maintenance "would clearly fall with the discretionary function exemption"); Brotman v. United States, 111 F. Supp. 2d at 418 (barring claims of injury due to improper lighting and failure to warn in Statue of Liberty where policy merely stated that "all prudent measures shall be taken to protect the safety of the public" but did not prescribe any particular safety measure).

In the end, although mindful that an overly broad construction of the discretionary function exclusion could eviscerate the government's waiver of sovereign immunity, see Morales v. United States, 961 F. Supp. 633, 636 (S.D.N.Y. 1997), the Court is satisfied that the government here has shown that the challenged conduct involved an act of official discretion, susceptible to a policy based judgment. See Boldue v United States, 402 F.3d at 62; Brotman v. United States, 111 F. Supp. 2d at 425.

Cases cited by the plaintiff have failed to convince the Court otherwise. For instance, plaintiff quotes from the decision in Ireland v. Suffolk County of New York, 242 F. Supp. 2d 178, 189 (E.D.N.Y. 2003), for the proposition that "the negligent omission of information regarding easily-correctable dangers [is] not a decision that [is] susceptible to policy analysis."

(Pl.'s Post Hrg Mem. at 65) (internal quotations omitted).[19] In Ireland, a property owner sued the government based on a claim that stone groins on the beach near her home had been negligently designed, installed and maintained, resulting in damage to her property. Id. at 181. The court in Ireland not only held that the discretionary function exception applied to insulate the government from liability, but the court actually used the language quoted by plaintiff to describe and distinguish the holding of the Second Circuit in Andrulonis v. United States, 952 F.2d 652, 655 (2d Cir. 1991), cert. denied, 514 U.S. 1204 (1992).

In Andrulonis, a scientist employed by the Center for Disease Control ("CDC") failed to warn about dangerous conditions in the laboratory where experiments were being conducted on a rabies virus, resulting in severe injuries to a fellow researcher. Id. at 653. Distinguishing the decision in Gaubert, 499 U.S. at 326-27, where there was a clear regulatory scheme that entrusted government officials with the discretion "to effectuate a clearly-defined policy," the court in Andrulonis found that "it is hardly conceivable that the CDC would ever have a policy to keep silent about obvious, easily-correctable dangers in experiments using drugs supplied by the CDC." Id. at 655. The court concluded that because the CDC employee's decision to ignore unsafe laboratory conditions could not possibly have been grounded in CDC policy, the discretionary function exception did not apply. Id.

Although plaintiff cites Andrulonis for the proposition that a negligent failure to warn does not fall within the exception because such a decision does not involve a policy judgment

---

[19]Citations to "Pl.'s Post Hrg Mem." refers to Plaintiff's Proposed Findings of Fact and Conclusions of Fact, filed on September 8, 2008.

(Pl.'s Post Hrg Mem. at 66), unlike <u>Andrulonis</u>, the challenged government action here is not the result of a decision by one employee disregarding a substantial risk of which he was uniquely aware; rather, it involves a macro-decision by the NPS and Riis Park·Beach authorities to design beach safety procedures that were appropriate to this specific beach. <u>Cf.</u> <u>Mandel v. United States</u>, 793 F.2d 964 (8th Cir. 1986) (holding that the discretionary function exception did not shield the government from liability where an individual park ranger failed to comply with safety policies by recommending that a park patron dive into a swimming hole). Moreover, as discussed <u>supra</u>, the government here was operating under a clear regulatory scheme that explicitly entrusted government officials with the discretion to implement the stated policies of the NPS.

Accordingly, because the Court finds that the challenged government conduct at issue involves an act of official discretion, and that this discretion was grounded in considerations of policy, the Court holds that the discretionary function exception deprives this Court of subject-matter jurisdiction to consider plaintiff's claims under the FTCA. <u>See</u> <u>United States v. Gaubert</u>, 499 U.S. at 322-28 (noting that the purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of policy determinations").

B. <u>Lack of Duty</u>

Even if the Court had subject matter jurisdiction to hear this case, the Court finds that plaintiff has failed to establish that the government had a duty to warn or that it was negligent in this case.

1) Landowner's Duty of Care

In determining the government's duty to warn, the Court looks to New York State law because the accident and the alleged negligent act occurred in the State of New York. See 28 U.S.C. § 2674; Hess v. United States, 361 U.S. 314 (1960); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). Under New York law, the plaintiff bears the burden of proving that his injuries were proximately caused by defendant's negligence. Carabello v. United States, 830 F.2d 19, 22 (2d Cir. 1987). Thus, in order to establish negligence on the part of the government, plaintiff must prove the existence of a duty owed to him, a breach of that duty, and that he suffered injury as a result of the government's breach of that duty. See Akins v. Glens Falls City School Dist., 53 N.Y.2d 325, 333, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644, 648 (1981); see also Furey v. United States, 458 F. Supp. 2d 48, 52 (N.D.N.Y. 2006). In the absence of a duty, defendant cannot be held liable for plaintiff's injury. Furey v. United States, 458 F. Supp. 2d at 52 (citing Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000)).

2) Reasonable Care Standard

The standard of care owed by a landowner to someone lawfully on the landowner's premises requires that "'the landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.'" Basso v. Miller, 40 N.Y.2d 233, 240-41, 352 N.E.2d 868, 872, 86 N.Y.S.2d 564, 568 (1976) (internal citation omitted); see also Akins v. Glens Falls City School Dist., 53 N.Y.2d at 333, 424 N.E.2d at 535, 441 N.Y.S.2d at 648.

In Herman v. State of New York, 63 N.Y.2d 822, 472 N.E.2d 24, 25, 482 N.Y.S.2d 248 (1984), the New York Court of Appeals examined the duty owed by property owners to warn of the existence of sandbars on the ocean floor and, on facts similar to this case, ruled that the State had no duty to warn of the "natural, shifting condition" of sandbars on the ocean floor. Id. (finding no negligence on part of beach owner where plaintiff ran into the water at a New York beach and executed a surface dive in waist-high water, striking his head on a sandbar not visible from the surface and sustaining serious and permanent injuries). The court reasoned that "to be liable for failure to warn of a dangerous condition, a property owner must have notice of the condition itself as well as the unreasonable risk it creates." Id. It further noted, "defendant could not anticipate a danger to swimmers simply from the existence of the natural, shifting condition of sand bars in the ocean." Id.; see also Saland v. Village of Southampton, 242 A.D.2d 568, 569, 662 N.Y.S.2d 322, 323 (2d Dep't 1997) (holding that where plaintiff jogged into the surf and dove headfirst into a submerged sandbar, the defendant village was not liable and had no duty to "anticipate and protect against threats to swimmers arising from the existence of natural, transitory conditions of the ocean floor"); Smyth v. County of Suffolk, 172 A.D.2d 741, 741, 569 N.Y.S.2d 128, 129 (2d Dep't 1991) (finding no liability for failing to warn of the transitory conditions on the ocean floor where plaintiff sustained personal injuries after executing a surface dive into the ocean and striking his head on the sea bottom); Perez v. Town of East Hampton, 166 A.D.2d 640, 640, 561 N.Y.S.2d 69, 69 (2d Dep't 1990) (finding no liability on the part of defendant where plaintiff jogged into waist-deep water, executed a surface dive, and struck his head on a submerged sandbar, and ruling that "[u]nder Herman, property owners are relieved of

the duty to warn of sandbars").[20]

Courts in this district have followed Herman and previously declined to impose upon the government a duty to warn of sandbars at Riis Park. See McCullough v. United States, No. 80 CV 3037, 1995 WL 264033, *1 (E.D.N.Y. Apr. 27, 1995) (noting that "[t]he facts in Herman are precisely the same as the facts here in every respect," and dismissing plaintiff's claim that he sustained injuries at Riis Park after running into the surf and diving outward in water that was above his waist, striking his head on a submerged sandbar). As in this case, there were no signs posted on the beach warning of any dangerous or hidden conditions such as sandbars. In considering the plaintiff's argument that the government should have posted warning signs, the court in McCullogh found that the highly transitory nature of sandbars would render any warning meaningless and that the plaintiff should have known of the dangers posed by sandbars.

Despite the holdings in Herman and McCullogh, this Court previously denied defendant's

---

[20]In addition to stressing the transient nature of sandbars, the Appellate Division in Herman also reasoned that the plaintiff knew or should have known of any danger posed by sandbars because he had frequented the area of the beach where his injury occurred approximately six times in the summer of his accident. See Herman v. State of New York, 94 A.D.2d 161, 163, 463 N.Y.S.2d 501, 502 (2d Dep't 1983), aff'd, 63 N.Y.2d 822, 472 N.E.2d 24, 482 N.Y.S.2d 248 (1984). Indeed, New York courts have consistently stated that a person who participates in water sports assumes the reasonably foreseeable risks therein. See Saland v. Village of Southampton, 242 A.D.2d at 569, 662 N.Y.S.2d at 323 (implying that diving into a submerged sandbar is a reasonably foreseeable risk of ocean swimming and citing Smyth v. County of Suffolk, 172 A.D.2d at 741, 569 N.Y.S.2d at 129, and Perez v. Town of East Hampton, 166 A.D.2d at 640, 561 N.Y.S.2d at 69). Here, plaintiff conceded that he had been swimming in the ocean when he was a teenager and had been to Riis Park prior to the day of his accident. (Tr. at 61). It is reasonable to conclude that, having gone swimming in the ocean before, plaintiff knew or should have known of the potential danger of diving headfirst into shallow water. However, because the Court finds no duty on the part of the government to warn in this case, the Court has not considered the plaintiff's own conduct in rendering this opinion.

motion for summary judgment, based on the proposition, recognized by New York courts, including <u>Herman</u>, that a property owner may be held liable for the failure to warn of a dangerous condition if the property owner is on notice of the condition and the unreasonable risk it creates. (Summary Judgment Order[21] at 22-26 (quoting <u>Herman</u> 63 N.Y.2d at 823, 472 N.E.2d at 25, 482 N.Y.S.2d 249)).  At the time of the summary judgment motion, plaintiff's expert, Frances Cosgrove, issued an opinion in opposition to the defendant's motion, which indicated that it was industry custom for ocean beach facilities to detect and warn beach-goers of hazardous conditions, including sandbars.[22]  The Court, based on Mr. Cosgrove's uncontested report, and, accepting as true for purposes of the motion plaintiff's claim that he struck his head on a sandbar, held that there were material issues of fact in dispute that required a trial.  The issues to be determined at trial were whether there was a sandbar present at 1:00 p.m. on the day of plaintiff's accident, whether the lifeguards should have detected that sandbar if they had been acting reasonably, and whether there was an industry custom that required the government to provide a warning.

---

[21]Citations to "Summary Judgment Order" refer to this Court's Order denying summary judgment on October 23, 2007.

[22]In his report, Mr. Cosgrove opined that, "[i]t is well recognized within the local and national beach safety/administration industry that, as underwater conditions at an ocean beach change daily, the lifeguards at an ocean beach are required to be constantly aware of these changing situations, including hazardous surf conditions and obstructions, such as sandbars." (Cosgrove Aff. ¶ 5).  Mr. Cosgrove further stated that "[t]hese industry standards, including standards promulgated by the Consumer Products Safety Commission in its reports on Aquatic Safety Signage and the American National Standards Institute ("ANSI") [in its reports on] facilities warning signage, require that upon the location of a submerged surf hazard/obstruction, an ocean bathing beach facility post signs warning of the underwater condition, and prohibiting potentially hazardous activities, such as bathing, wading or diving in the area of said hazardous condition." (<u>Id.</u> ¶ 8).

Having now heard the testimony of the witnesses and having had the benefit of observing their demeanor as they testified, the Court concludes that plaintiff has failed to establish by a preponderance of the evidence that a sandbar existed in the area of the ocean floor where plaintiff suffered his diving injuries.[23] Plaintiff clearly does not know what he hit his head on; he has never testified that he hit his head on a sandbar or that he observed a sandbar in the water. All he could say was that he hit something "soft but firm." (Tr. at 56). As Dr. Williams noted, the fact that the plaintiff described hitting his head on something firm was equally consistent with hitting his head on the sandy bottom of the ocean floor as with a sandbar. (Id. at 31).

Neither the lifeguard, Christin Mullen, nor her supervisor, Lieutenant Snapper, observed a sandbar in the vicinity of plaintiff's accident. Ms. Mullen testified that, during the course of her morning swim that day, she did not observe any unusual sand formations, nor did she observe any sandbars as she was seated in her lifeguard chair despite having been trained to recognize them. (Tr. at 170, 176, 194-95, 197). She further testified that no one on the scene that day informed her that there was a sandbar or other dangerous condition in the area. (Id. at 197). Similarly, Lieutenant Snapper testified that immediately after the accident, he conducted a search of the area but found nothing unusual in the water. (Id. at 226-31). He certainly did not observe a two to three foot sandbar in the Bay 7 area, and no one on the beach complained to him about such a sand formation being present that day. (Id. at 239).

The only witness to the day's events who identified any unusual sand formation that

---

[23]No one disputes that there is a permanent sandbar located approximately 300 feet off shore, but this sandbar was nowhere near where plaintiff was injured and was not involved in this accident. (Tr. at 186, 647).

might amount to a sandbar is plaintiff's fiancé or girlfriend, Ms. Berrio. (Id. at 100). In evaluating her testimony, the Court notes that there were a number of inconsistencies in her testimony that call into question the accuracy of her recollection of the day's events. Ms. Berrio's testimony regarding the distance which plaintiff allegedly ran into the water, whether he ran in at an angle or not, and most importantly the height of the alleged slope of sand has differed over time. Most significant is her change in testimony regarding the height of the sand which was 22 inches at the time of her deposition but which became 3 feet at the time of trial. (Id. at 131-34). Surely at 3-foot sandbar would have been noticed by someone else that day.

Moreover, the EMT report prepared by Marianne Sawyer on the day of the accident makes no mention of a sandbar despite the fact that Ms. Berrio was speaking to Ms. Sawyer on the beach. To the contrary, Sawyer's report actually indicates that plaintiff "went headfirst into surf and hit jetty." (Tr. at 35-38). Although it appears that Ms. Berrio provided much of the information about plaintiff's accident that is reflected in the EMT report, she did not tell Ms. Sawyer that the plaintiff struck his head on a sandbar. Ms. Sawyer testified that had someone mentioned a sandbar, she would have recorded that in her report

Plaintiff argues that the government's witnesses, particularly Lieutenant Snapper and Ms. Sawyer, were not credible and suggests that their testimony was contradicted by both plaintiff's expert and the government's own expert witnesses. Specifically, plaintiff points to Lieutenant Snapper's testimony that despite his 28 years of experience, he was not familiar with the concept of a ridge and runnel system being a sandbar or that he had ever seen the type of sand formation described by Ms. Berrio. (Pl.'s Mem. at 31). Although both plaintiff's expert, Peter Rosen, and

the government's expert, S. Jeffers Williams, testified that Ms. Berrio's testimony was consistent with a description of the landward side of a ridge and runnel system, the experts were not present on the scene at the time and did not actually observe the sand formation described by Ms. Berrio. More importantly, neither expert testified that three foot sandbars were commonly found in the area of Riis Park Beach. Absent such testimony, the Court finds no basis on which to discredit Lieutenant Snapper's testimony.

Plaintiff also challenges the credibility of Ms. Mullen's testimony that she did not observe a sandbar during her swim on the day of the accident, noting that she testified that during the eight years she worked as a surf guard at Riis Park, she had never seen an inshore sandbar of the type described by Ms. Berrio. (Pl.'s Mem. at 34). Plaintiff argues that Ms. Mullen's credibility is further suspect because she also testified that even though she had never seen a sandbar like this in eight years, she nonetheless swam in the area and searched the ocean floor each and every day. The fact that Ms. Mullen had never seen a sandbar of the magnitude described by Ms. Berrio is not only consistent with the testimony of Lieutenant Snapper, but regardless of whether she had ever seen such a sandbar, she still had the duty to conduct an inspection of the swimming area. She testified that she was required to do this inspection on a daily basis – not only to detect sandbars, but also to identify any underwater hazards that might create a danger to the public. Thus, the Court finds that there is nothing inconsistent with her testimony insofar as she described her duty to swim and patrol the area.

Similarly, Lieutenant Snapper's testimony is entirely consistent with that of Ms. Mullen in that he conceded that when he inspected the area after the accident, he observed that "the usual

undulations of the ocean bottom" were present. (Tr. at 855-56). This testimony does not, as plaintiff asserts, corroborate Ms. Berrio's testimony that the sand in the area of Mr. Brown's accident suddenly and precipitously rose up three feet higher than the ocean bottom. Neither does the fact that plaintiff's expert, Dr. Rosen, produced photographs taken in February 2008 of a ridge and runnel system present in the area of the beach. Not only is there no evidence that this same formation existed at the time of the accident, but the photographs demonstrate a significantly smaller differential in the height of the sand from that described by Ms. Berrio.

All of the experts who testified, including plaintiff's own experts, agreed that if there had been a sand formation of the type described by Ms. Berrio, the lifeguards would have seen it. Mr. Cosgrove testified that if there was an inshore bar, one would simply have to walk into the water and it should be obvious. (Id. at 267). Dr. Rosen, who based his opinion regarding the existence of the sandbar on Ms. Berrio's testimony, conceded that a sandbar of the type she described would have been visible under one foot of water. (Id. at 433). Similarly, the government's expert, Dr. Williams, testified that a trained lifeguard would have seen a sandbar 20 to 35 feet off shore under the conditions described. (Id. at 589-90).

The Court credits the experts' testimony that a sandbar such as the one described by Ms. Berrio would have been obvious to a trained lifeguard and even to the untrained eye of an average beach patron. (See, e.g., id. at 589-90). Moreover, the scientific evidence demonstrates that a sand formation of the size described by Ms. Berrio would not have come and gone between the time of Ms. Mullen's swim and plaintiff's accident, nor would it have disappeared in the minutes between plaintiff's accident and Lieutenant Snapper's inspection of the area. Dr. Rosen

testified that migration of a ridge such as this takes place slowly over a matter of weeks in tidal areas and even longer in non-tidal areas such as Riis Park Beach. (Id. at 397). Based on the demeanor of the witnesses, coupled with a consideration of the other evidence presented, the Court credits the testimony of Lieutenant Snapper and Ms. Mullen and finds by a preponderance of the evidence that no sandbar existed at the time of the accident.

It should be noted that the Court has also considered Mr. Brown's testimony as to how the accident occurred and concludes that he struck the bottom of the ocean floor while executing his dive. He testified that when the water was little more than knee deep, he dove forward, arms in front, took one breast stroke and slammed his head into something with such force as to render him paralyzed. (Id. at 47-49). Mr. Prokop, who was a lifeguard for over 10 years before he became a park ranger responsible for supervising lifeguards, testified that what Mr. Brown described was "not a shallow dive" but "a deep dive." (Id. at 875). Moreover, it is difficult to see how plaintiff could have hit his head with such force if, in fact, he hit his head while executing a swimming stroke. Common sense suggests that he more likely struck his head on the bottom while executing a deeper dive.

Given the Court's finding based on the credibility of the witnesses and the overall weight of the evidence, the Court finds that plaintiff has failed to establish that there was a sandbar present on that day or that he struck his head on a sandbar.

In the absence of proof of the existence of a dangerous condition, there is no need to address plaintiff's arguments that the government had constructive knowledge or should have known that a dangerous condition existed. Similarly, the Court need not address the plaintiff's

claim that industry standards require the government to warn of the existence of sandbars or to take the steps advocated by plaintiff's expert, such as shutting the beach, posting signs or whistling to bathers.

Finally, the government contends that plaintiff's own negligence and assumption of risk bars the action against the government. Given that the Court finds no basis upon which to impose a duty on the defendant, there is no need to address the plaintiff's conduct in this case.

## CONCLUSION

For the reasons set forth above, the Court finds in favor of defendant. The Clerk of the Court is directed to enter judgment in favor of defendant.

**SO ORDERED**

Dated: Brooklyn, New York
      September 30, 2009

Cheryl L. Pollak
United States Magistrate Judge